**In re Petition of Ilan SHAVIT, as Interim Liquidator of Red Rock Commodities, Ltd., and Red Rock Holdings, Ltd., Debtors in a Foreign Proceeding.**

**Bankruptcy No. 94–B–44586.**

United States Bankruptcy Court,
S.D. New York.

July 10, 1996.

Lichtenberg & Ginach, P.C. (Uri Sella, of counsel), New York City, Haim Zadok & Co. (Gideon Toledano, of counsel), Tel–Aviv 66 883, Israel, for Petitioner.

Duker & Barrett, L.L.P. (Laura A. Hastings, of counsel), New York City, for Respondents.

## MEMORANDUM DECISION GRANTING PETITIONER'S MOTION FOR A VOLUNTARY DISMISSAL WITHOUT PREJUDICE

STUART M. BERNSTEIN, Bankruptcy Judge.

Ilan Shavit (the "Petitioner" or "Shavit") moves to dismiss this ancillary case, commenced under 11 U.S.C. § 304, without prejudice. Red Rock Commodities, Ltd. ("Commodities") and Red Rock Holdings, Ltd. ("Holdings", and jointly with Commodities, the "Debtors") do not oppose the dismissal,

but insist that it be with prejudice. The Debtors also seek costs and attorneys' fees. Because the Debtors have failed to allege or show legally sufficient prejudice or bad faith, the Petitioner's motion is granted, and the petition is dismissed without prejudice, and without costs or attorneys' fees.

## FACTS

The Debtors are Delaware corporations and formerly engaged in the business of commodities trading. At all relevant times, Menachem Pri–Har ("Pri–Har") was the Debtors' president, and the Debtors conducted business out of an office located at 120 West 45th Street, New York, New York. Pri–Har is presently serving a fourteen year prison sentence imposed by the United States District Court for the Southern District of New York. The sentence follows a conviction, after a jury trial, on twenty-four counts that include conspiracy, wire and bank fraud and making false statements.

In or about June 1993, and over the Debtors' objection, the Tel Aviv–Jaffa District Court appointed Shavit to act as Interim Liquidator of the Debtors. It acted under section 380 of the Israeli Companies Ordinance (1993)[1] which authorizes an Israeli court to liquidate a foreign corporation that has assets in Israel. In asserting jurisdiction, the Israeli court relied solely upon the existence of a cause of action asserted by the Debtors against Ram Industries Ltd.:

It appears that the foreign companies entered into significant transactions in Israel with Olges Ltd. and Ram Industries Ltd., and they have, according to their own statements, good causes of action for millions of dollars against Ram Industries Ltd. (In Liquidation). This action is, it appears, their asset in Israel for purposes of Section 380 of The Companies Ordinance.

Accordingly, I have determined that this Court has jurisdiction to conduct hearings regarding the liquidation of the above foreign companies and each and every one of them.

(Tel Aviv District Court Order, Civ. Case No. 307/93, June 29, 1993, at p. 5.)

On August 2, 1994, the Israeli Court granted Petitioner's request to commence this ancillary case pursuant to 11 U.S.C. § 304, and the Petitioner filed his petition on September 29, 1994. After filing their answer and counterclaims (which were eventually dismissed), the Debtors moved to dismiss the petition, or alternatively, for summary judgment. They made a variety of arguments that primarily boiled down to two points: (1) the Debtors are American corporations, and hence, should not be subject to liquidation in Israel, and (2) the Debtors had no assets in, or substantial connection with, Israel. The Petitioner, on the other hand, argued that the principal assets and place of business were located in Israel, and the petition, which he certified under the penalty of perjury to be true and correct, set forth numerous facts supporting his contention.[2]

---

1. Section 380 provides, in pertinent part, as follows:

The provisions of chapters eleven through seventeen [winding up] and section 232 [security for trial costs] shall also apply, *mutatis mutandis*, to the winding up by the court or under its supervision of any foreign company that has assets in Israel, whether it is registered in Israel or not....

2. The petition alleges that the Debtors conducted most of their business in or with Israel, where the Debtors principal assets were located at the time of commencement of this proceeding. (Petition at ¶ 3.) According to the petition, these principal assets included the following:

1. Commodities had asserted a $20 million secured claim against Ram Metal & Construction Industries, Ltd. ("Ram"), a company undergoing liquidation in Israel. A lawsuit to determine the validity of the secured claim is pending in Israel, with Petitioner substituted as party plaintiff.

2. Commodities had filed a $10 million lawsuit against several Polish vessels and Israeli shipping agents, alleging that the defendants were parties to a fraud perpetrated on Commodities by Ram. This action is also pending in Israel, with Petitioner substituted as party plaintiff.

3. The Debtors alleged claims against Union Bank of Israel, Ltd., an Israeli Bank, in amounts exceeding $20 million.

4. Shavit has commenced actions against certain individuals in Israel to set aside alleged fraudulent transfers of the Debtor's property. The two claims aggregate $3,180,000.00.

5. Between 1990 and 1992, the Debtors fraudulently transferred $5 million worth of property to an Israeli affiliate, Olges Ltd., and

The hearing on the Debtor's motion clarified the parties' positions. The Petitioner acknowledged that he did not know of any United States assets, and at that moment, only sought discovery. (Transcript of hearing, held Apr. 6, 1995, at 24–25.) The Debtors, on the other hand, conceded that their objection to Shavit's standing, and ultimately, to relief under 11 U.S.C. § 304(c), turned on the same issue: did the Debtors' have sufficient assets in Israel to support the filing of the ancillary petition and the granting of assistance to the Israeli court under the doctrine of comity. (*Id.* at 38.) In light of the factual nature of the dispute, I directed the parties to conduct discovery regarding the location of the Debtors' assets with a view toward holding a single hearing on the Petitioner's standing and his right to relief.[3] (*See* Order, dated Apr. 25, 1995.)

After conducting discovery for nearly one year, Shavit moved to dismiss this ancillary case without prejudice. In the course of discovery, Shavit had failed to locate any significant assets in the United States, and determined that continuing the ancillary case was a waste of time and money which he did not have. In the declaration supporting his motion, he explained:

9. After reviewing Respondent's Answers to Petitioner's Interrogatories, and after reviewing the documents produced by the Respondents, I have not been able to identify or locate any meaningful assets of the Red Rock Companies in the United States. Thus, it is my belief that the continuation of these Ancillary Proceedings would not benefit the interests of the creditors of the Red Rock Companies.

10. Currently, the Israeli estate, which I represent in this case, has no financial means. The Israeli estate will not be able to bear the costs, expenses and attorneys fees which are expected to be incurred as a result of the continuation of these proceedings.

(Declaration of Ilan Shavit, dated March 26, 1996, at ¶¶ 9–10.) The Debtors responded

Olges parent company, Golden Eagle, Inc. Olges is currently in liquidation in Israel. (Petition at ¶ 16.)

that the dismissal should be with prejudice in order to prohibit the Petitioner from filing another ancillary proceeding. (Transcript of hearing, held Apr. 18, 1996, at 6).

At the hearing on the Petitioner's motion, the Court and the parties explored the meaning and scope of a dismissal with prejudice in the context of an ancillary case. Although the parties, with the Court's assistance, tried to work out acceptable language that would impose certain terms and conditions on any future filing, the parties could not agree. Accordingly, I took the Petitioner's motion under advisement.

## DISCUSSION

### A. Introduction

■ A proceeding under section 304 is *sui generis.* Unlike a full-scale bankruptcy case, its commencement does not trigger the automatic stay, or cloak the petitioner with avoiding powers, *see Cunard S.S. Co. v. Salen Reefer Servs. AB,* 773 F.2d 452, 454–55 (2d Cir.1985); *In re Axona Int'l Credit & Commerce Ltd.,* 88 B.R. 597, 606 (Bankr.S.D.N.Y. 1988); *In re Gee,* 53 B.R. 891, 896 (Bankr. S.D.N.Y.1985); 2 Lawrence P. King, *Collier on Bankruptcy,* ¶ 304.01, at 304–03 (15th ed. 1996) ("*Collier* "), or create an estate. *See* 11 U.S.C. § 541(a) ("The commencement of a case under section 301, 302, or 303 of this title creates an estate."). The foreign debtor need not even be eligible to be a debtor under 11 U.S.C. § 109. *Goerg v. Parungao (In re Goerg* ), 844 F.2d 1562, 1568 (11th Cir.1988), *cert. denied,* 488 U.S. 1034, 109 S.Ct. 850, 102 L.Ed.2d 981 (1989); *accord* 2 *Collier* ¶ 304.02, at 304.6. Instead, "a 304 case is a limited one, designed to function in aid of a proceeding pending in a foreign court." *In re Gee,* 53 B.R. at 896.

■ In enacting section 304, Congress recognized the increasing number of foreign insolvency proceedings and their effect on American assets and interests. It sought, through section 304, to create a mechanism for courts in this country to provide flexible

3. While I did not issue a formal ruling, the disposition of the matter clearly implied that the Debtors' motion was denied.

assistance to their foreign counterparts, *see generally* 2 *Collier* ¶ 304.01; *In re Gee*, 53 B.R. at 896, and to give effect to the principle of comity. *Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 714 (2d Cir. 1987); H.R.Rep. No. 595, 95th Cong., 2nd Sess. 324–25 (1978) U.S.Code Cong. & Admin.News 1978, pp. 5963, 6280–6281; S.Rep. No. 989, 95th Cong., 2d Sess. 35 (1978) U.S.Code Cong. & Admin.News 1978, pp. 5787, 5821 ("Principles of international comity and respect for the judgments and laws of other nations suggest that the court be permitted to make the appropriate orders under all of the circumstances of each case, rather than being provided with inflexible rules."); *see also* Stuart A. Krause, Peter Janovsky, & Marc A. Lebowitz, *Relief Under Section 304 of the Bankruptcy Code: Clarifying the Principal Role of Comity in Transnational Insolvencies*, 64 Fordham L.Rev. 2591, 2594–95 (1996). "A section 304 proceeding was conceived as a more efficient and less costly alternative to a full bankruptcy case," *In re Axona Int'l Credit & Commerce Ltd.*, 88 B.R. at 607, with the court "free to broadly mold appropriate relief in near blank check fashion. . . ." *In re Culmer*, 25 B.R. 621, 624 (Bankr.S.D.N.Y.1982); *see also Angulo v. Kedzep Ltd.*, 29 B.R. 417, 419 (S.D.Tex.1983) (the scope of section 304 is flexible enough to be used for limited purpose of obtaining discovery).

■ Section 304 is aimed at "foreign debtors," and hence, the initiation of this case raised a threshold and untested issue under section 304: should an American bankruptcy court ever entertain an ancillary petition filed in connection with the *involuntary* foreign liquidation of an American company? The Israeli court had rejected the Debtors' argument that they could not be liquidated in Israel, but based its decision on Israeli law. Further, although the Israeli court specifically granted the Petitioner authority to file this ancillary case, his standing turns on federal bankruptcy law. *See In re Tam*, 170 B.R. 838, 843–44 (Bankr.S.D.N.Y.1994).

At the April 1995 hearing in connection with the Debtors' motion to dismiss, I had resisted the Debtors' urging to dismiss this case as a matter of law, referring to the provisions of the Bankruptcy Code that seemed to recognize that section 304 could cover a situation like the present one. In this regard, 11 U.S.C. § 304(a) authorizes a foreign representative [4] to file a case ancillary to a "foreign proceeding." Under section 101(23), a

> "foreign proceeding" means proceeding, whether judicial or administrative and whether or not under bankruptcy law, in a foreign country in which the debtor's domicile, residence, principal place of business, or principal assets were located at the commencement of such proceeding, for the purpose of liquidating an estate, adjusting debts by composition, extension, or discharge, or effecting a reorganization.

■ The definition seems plain and unambiguous. It does not restrict a "foreign proceeding" to the liquidation of a non-United States company; to the contrary, it implicitly recognizes that a foreign court can, at least in some instances, wind up an American company. To qualify as a "foreign proceeding," the debtor undergoing a foreign judicial or administrative liquidation (or rehabilitation) must meet only one of four criteria. Two of the criteria—principal place of business and principal assets—do not depend on the place where the debtor was formed or resides. Thus, while the debtor must have a "substantial connection" with the host country to support a foreign rehabilitation or liquidation, H.R.Rep. No. 595, 95th Cong., 1st Sess. 311 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 24 (1978), 2 *Collier* ¶ 304.02, at 304–6, it need not be formed under the laws of that country, and in appropriate circumstances, could be formed under American law. Accordingly, the foreign liquidation of an American company, whose principal place of business or principal assets exist in the foreign state, can

4. Under section 101(24), " 'foreign representative' means [a] duly selected trustee, administrator, or other representative of an estate in a foreign proceeding." The Debtors have not argued in this Court that the Petitioner was not "duly appointed." Rather, they contend that the Israeli liquidation is not a "foreign proceeding."

qualify as a "foreign proceeding" for purposes of federal bankruptcy law.[5]

## B. Dismissal of an Ancillary Proceeding

### 1. Introduction

■ The parties never reached the merits of Shavit's standing or his right to relief. Instead, Shavit moved to dismiss his petition without prejudice. The dismissal of an ancillary petition has received minimal attention to the point of being overlooked. Fed. R.Bankr.P. 1017(a), which establishes the procedure governing the voluntary dismissal of bankruptcy cases, does not apply. *Id.* (Advisory Committee Note) (1983) ("This subdivision implements §§ 303(j), 707, 1112 and 1307 of the Code....") Further, Fed. R.Bankr.P. 1018, which makes certain provisions of Part VII of the Federal Bankruptcy Rules applicable to contested ancillary proceedings, omits Rule 7041 which deals expressly with the voluntary dismissal of an adversary proceeding.[6]

■ Both parties in this case have assumed that Fed.R.Civ.P. 41 (and its bankruptcy analogue, Fed.R.Bankr.P. 7041) govern Shavit's motion. Nothing expressly supports this assumption, but Fed. R.Bankr.P. 1018 authorizes a bankruptcy court to direct that other Rules in Part VII shall apply. Since a contested ancillary case like this one more closely resembles an adversary proceeding between two litigants rather than an actual bankruptcy case, the Court concludes that Fed.R.Civ.P. 41 and Fed.R.Bankr.P. 7041 should govern the disposition of this motion, and directs their application. *See In re Kingscroft Ins. Co.,* 150 B.R. 77, 81 (Bankr.S.D.Fla.1992) (dismissing the ancillary petition and citing to Federal Bankruptcy Rules 1018 and 7041); *cf. King v. Fidelity Nat'l Bank,* 712 F.2d 188, 190 (5th Cir.1983) (directing that Fed.R.Civ.P.

21 apply to sever and dismiss an improperly filed joint involuntary petition); *In re South Florida Title, Inc.,* 92 B.R. 548, 549 (Bankr. S.D.Fla.1988) (same).

### 2. Fed.R.Civ.P. 41(a)

■ Fed.R.Civ.P. 41(a)(2), made applicable to this proceeding by Fed.R.Bankr.P. 7041, provides in relevant part as follows:

> Except as provided in paragraph (1) of this subdivision of this rule, an action shall not be dismissed at the plaintiff's instance save upon order of the court and upon such terms and conditions as the court deems proper.... Unless otherwise specified in the order, a dismissal under this paragraph is without prejudice.

The granting of a motion to dismiss without prejudice under Rule 41(a)(2) lies within the court's discretion, and not at the plaintiff's behest as a matter of right. *Zagano v. Fordham Univ.,* 900 F.2d 12, 14 (2d Cir.), *cert. denied,* 498 U.S. 899, 111 S.Ct. 255, 112 L.Ed.2d 213 (1990); *Adkinson v. LTV Corp. (In re Chateaugay Corp.),* 165 B.R. 130, 132 (S.D.N.Y.1994); 5 James Wm. Moore, *Moore's Federal Practice* ¶ 41–05[1], at 41–52 (2d ed. 1995) ("*Moore's* "). A voluntary dismissal without prejudice puts the plaintiff in the same legal position as if it had never commenced the action, and renders all prior proceedings a nullity. *See Sandstrom v. ChemLawn Corp.,* 904 F.2d 83, 86 (1st Cir. 1990); 5 *Moore's* ¶ 41–05[2], at 41–73. Conversely, a dismissal with prejudice is a complete adjudication on the merits, with *res judicata* effect. *See Harrison v. Edison Bros. Apparel Stores, Inc.,* 924 F.2d 530, 534 (4th Cir.1991); *LeCompte v. Mr. Chip, Inc.,* 528 F.2d 601, 603 (5th Cir.1976); 5 *Moore's* ¶ 41.05[2], at 41–71 (a dismissal with prejudice operates to bar another action on the claim that was so dismissed).

---

**5.** The Israeli court identified only one asset as the basis of its jurisdiction—the cause of action against Ram Industries. Under Section 304, however, Shavit would have to prove that the Debtors' principal assets were situated in Israel.

**6.** Although 11 U.S.C. § 305(a)(1) arguably encompasses a petitioner's motion to dismiss his own ancillary case based upon the interests of the creditors and the debtor, it would rarely be

applicable. Section 305(a)(1) addresses the situation in which a less expensive out-of-court workout is available. H.R.Rep. No. 595, 95th Cong., 1st Sess. 325 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 35–36 (1978), 2 *Collier* ¶ 305.02, at 305–6–7. A separate United States workout would rarely comport with the goal of centralizing the liquidation (or rehabilitation) of the debtor in the foreign court.

■ "Although voluntary dismissal without prejudice is not a matter of right, ... the presumption in this circuit is that a court should grant a dismissal pursuant to 41(a)(2) absent a showing that the defendants will suffer substantial prejudice as a result". *Guzman v. Hazemag U.S.A., Inc.,* 145 F.R.D. 308, 309 (E.D.N.Y.1993); *accord Indu Craft, Inc. v. Bank of Baroda,* No. 87 Civ. 7379, 1991 WL 107438 at *5 (S.D.N.Y. June 11, 1991); *Zimpro Inc. v. EPA,* 83 F.R.D. 302, 303 (N.D.N.Y.1979); *Harvey Aluminum, Inc. v. American Cyanamid Co.,* 15 F.R.D. 14, 18 (S.D.N.Y.1953); *accord Phillips USA, Inc. v. Allflex USA, Inc.,* 77 F.3d 354, 357 (10th Cir.1996); *Stevedoring Servs. of America v. Armilla Int'l B.V.,* 889 F.2d 919, 921 (9th Cir.1989). Substantial prejudice requires more than the prospect of a second suit concerning the same subject matter as the dismissed suit, *Brown v. Monsanto Co. (In re Paoli R.R. Yard PCB Litig.),* 916 F.2d 829, 863 (3d Cir.1990), *cert. denied sub nom., General Elec. Co. v. Knight,* 499 U.S. 961, 111 S.Ct. 1584, 113 L.Ed.2d 649 (1991); *LeCompte v. Mr. Chip, Inc.,* 528 F.2d at 603; *Watson v. Clark,* 716 F.Supp. 1354, 1355 (D.Nev.1989), *aff'd,* 909 F.2d 1490 (1990); 5 *Moore's* ¶ 41.05[1], at 41–65, even if the plaintiff intends to commence the second suit in a more favorable forum, *Harvey Aluminum, Inc. v. American Cyanamid Co.,* 15 F.R.D. at 18, or gain some other tactical advantage. *Watson v. Clark,* 716 F.Supp. at 1355; *see also* 5 *Moore's* ¶ 41.05[1], at 41–65 to 41–66 ("That plaintiff may obtain some tactical advantage by dismissal is insufficient ground for denial of the motion; substantial prejudice to the defendant should be the test.").

■ In *Zagano v. Fordham Univ.,* the Second Circuit laid out the factors to consider in deciding whether to grant a motion to dismiss an action without prejudice:

Factors relevant to the consideration of a motion to dismiss without prejudice include the plaintiff's diligence in bringing the motion; any "undue vexatiousness" on plaintiff's part; the extent to which the suit has progressed, including the defendant's effort and expense in preparation for trial; the duplicative expense of relitigation; and the adequacy of plaintiff's explanation for the need to dismiss.

900 F.2d at 14. These factors, however, are not exclusive, and all of the factors need not be resolved in favor of either party. *Phillips USA, Inc. v. Allflex USA, Inc.,* 77 F.3d at 358.

The *Zagano* factors weigh in favor of dismissing this ancillary case without prejudice. Shavit made the motion when the case was only eighteen months old, and before it had ever progressed to the merits. The parties engaged in discovery concerning the location of the Debtors' assets, and as a by-product, Shavit determined that even if he had standing, he could at best achieve an expensive, Pyrrhic victory. Shavit then moved promptly to dismiss this ancillary case, and not for the improper purpose of manipulating the litigation process. *Compare Greguski v. Long Island R.R. Co.,* 163 F.R.D. 221, 224 (S.D.N.Y.1995) (dismissing action with prejudice where plaintiff attempted to use motion for dismissal without prejudice as substitute for adjournment which court had denied) *with Jaskot v. Brown,* No. 94 Civ. 7161, 1996 WL 363082 at *2 (S.D.N.Y. July 1, 1996) (granting motion to dismiss without prejudice where plaintiff's desire to consolidate all of his claims in one action served the interests of judicial economy) *and Manners v. Fawcett Publications, Inc.,* 85 F.R.D. 63, 64 (S.D.N.Y. 1979) (dismissing action without prejudice where plaintiffs learned through pre-trial discovery that they could not prevail on their individual claims but intended to commence class action in state court).

Further, the Debtors have failed to demonstrate that they will suffer substantial prejudice. The Debtors' present attorneys have billed the Debtors $61,282.47 for their legal fees and expenses in connection with the defense against the Petition.[7] (Affidavit of Laura A. Hastings, sworn to Apr. 11, 1996, at ¶ 2.) It does not follow, however, that their legal services were either reasonable or necessary. The Debtors' attorneys devoted sub-

7. These are the second set of attorneys representing the Debtors. I have not received any information regarding what the first set charged.

stantial time and effort to the Debtors' motion to dismiss or for summary judgment. At the April 1995 hearing attended by present counsel, it became clear that the dismissal motion lacked merit and the resolution of the summary judgment motion hinged on disputed factual issues. Debtors' counsel also served a Rule 9011 motion which they ultimately withdrew. Hence, they rendered substantial services of dubious value in connection with motion practice that achieved virtually nothing.

Finally, the Debtors' own conduct in this ancillary case justifies a dismissal without prejudice. If the Petitioner took too long to make this motion, or missed an asset and needs to come back, the Debtors bear a large part of the blame. In his effort to discover assets and establish his standing, Shavit served interrogatories on the Debtors. The Debtors responded, by and large, with evasive answers and improper objections. For example, they responded to a specific interrogatory (No. 2) aimed at identifying the Debtors' bank accounts (by account number and branch location) with the statement that they "were doing business with Bankers Trust in New York City and Chemical in New York City, both of which may have relevant bank documents."

The other responses were not as informative. The Debtors refused to answer relevant interrogatories seeking to identify the Debtors' insurance policies (No. 11), accounts receivable (No. 13), real property (No. 14), furniture, machinery, equipment and fixtures (No. 15), stocks, bonds and securities (No. 16), life insurance and remainder interests (No. 23), any other assets (No. 25) and causes of action (No. 27). The only complete

response they gave related to interrogatory no. 3: the Debtors admitted that they had no safe deposit boxes.

Instead of providing information about their assets, the Debtors met the interrogatories with a host of objections, many of which were clearly improper. In response to virtually every question, they incorporated a general objection based upon the attorney client and work product privileges without satisfying the specificity requirements in former Local Bankruptcy Rule 14(e).[8] In addition, the Debtors repeatedly asserted the numerical limitation on interrogatories set forth in Fed.R.Civ.P. 33(a)[9], but this limitation does not apply because the Southern District district and bankruptcy courts have opted out of this provision. (*See* Orders of the United States District Court, Southern District of New York and United States Bankruptcy Court, Southern District of New York Order, both dated December 1, 1993.). Further, the objections based on relevance, vagueness and overbreadth are largely misplaced given the scope of the inquiry and the nature of the questions.

Finally, although former Local Bankr.R. 14(a) restricted the use of interrogatories at the beginning of discovery, former Local Bankr.R. 14(b) permitted the use of interrogatories if they were more practical than depositions or document production. At the time the Debtors asserted this particular objection, their president was serving a fourteen year prison sentence, and was not readily available for a deposition. Moreover, since the Debtors were essentially contending that most of their assets were in the United States rather than Israel, the Peti-

---

**8.** Former Rule 14(e), now substantially codified in Local Bankr.R. 7033-1, provided, in pertinent part, as follows:

> . . . .
>
> (2) Where a claim of privilege is asserted in objecting to any interrogatory or . . . sub-part thereof, and the answer is not provided on the basis of such assertion,
>
> (i) the attorney asserting the privilege shall in the objection to the interrogatory . . . or sub-part thereof, identify the nature of the privilege which is being claimed and if the privilege is being asserted in connection with a claim or defense governed by state law, indicate the state's privilege rule being invoked. . . .

The Debtors' attorneys ignored this requirement, and instead, used the blunderbuss approach. Since the majority of questions concerned the identity and location of the Debtors' assets, the invocation of any privilege seems improper.

**9.** Fed.R.Civ.P. 33(a), made applicable by Fed.R.Bankr.P. 7033, provides that "[w]ithout leave of court or written stipulation, any party may serve upon any other party written interrogatories, not exceeding 25 in number including all discrete subparts, to be answered by the parties served. . . ."

tioner's use of interrogatories to smoke out the identity and location of the Debtors' assets was the fastest and most direct way of obtaining the information germane to the issues to be tried.

Obviously, the Petitioner could have challenged the Debtors' evasive responses and improper objections through an appropriate motion, but did not. Further, I am not prepared to conclude that all of the objections were improper or asserted in bad faith. But it is not necessary that I do so to decide this motion. Beyond cavil, the Debtors were not forthcoming with their responses to the Petitioner's interrogatories. They created an obstacle to the Petitioner's prosecution of this case, and ultimately, his decision whether to proceed or dismiss. I would do a disservice to the principle of comity if I ignored the Debtors' efforts to stifle the Petitioner's legitimate inquiry, particularly after I ordered it. Under the circumstances, the Debtors contributed to the expense and any delay, and if the Petitioner, in the future, discovers United States assets, and decides to file another ancillary case, it is hardly the Debtors' place to argue that he should have identified and pursued the assets in the first ancillary case.

### 3. Costs and Attorneys' Fees

In opposing the unconditional dismissal of this ancillary case, the Debtors request that I require the Petitioner to pay their costs and attorneys fees. Although a court may impose such a condition under Rule 41(a)(2), it should do so only when justice so demands. *Manners v. Fawcett Publications, Inc.*, 85 F.R.D. at 65 (citing *Moore's* ¶ 41.05(5)). I see no reason in this case to depart from the "American Rule," and require one side to pay the other side's attorneys' fees. An exception to the "American Rule" is recognized when a litigant has commenced or conducted an action in "bad faith, vexatiously, wantonly, or for oppressive reasons." *Dow Chemical Pacific Ltd. v. Rascator Maritime S.A.*, 782 F.2d 329, 344 (2d Cir.1986) (citing *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247, 95 S.Ct. 1612, 1616–17, 44 L.Ed.2d 141 (1975)). The Second Circuit has declined to uphold

awards under the bad-faith exception "absent both clear evidence that the challenged actions are entirely without color and are taken for reasons of harassment or delay or for other improper purposes...." *Debruyn Produce Co. v. Sobiech*, No. 91 Civ. 7995, 1992 WL 168098, at *6 (S.D.N.Y. June 30, 1992) (citing *Dow Chemical Pacific Ltd. v. Rascator Maritime S.A.*, 782 F.2d at 344.) The Debtors have failed to show that this case was undertaken in bad faith or for an improper purpose—indeed, the Israeli court authorized Shavit to start it. Therefore, the Debtors' request for costs and attorneys' fees are denied.

### CONCLUSION

Finding neither substantial prejudice nor bad faith, I will dismiss this case without prejudice, and deny the Debtors' application to impose costs and attorneys' fees against the Petitioner. The most appropriate way to resolve this matter is to restore the *status quo ante*, as if the case had never been commenced. *See Sandstrom v. ChemLawn Corp.*, 904 F.2d at 86 (voluntary dismissal wipes the slate clean as if the dismissed action had never been brought).

The Court will enter an appropriate order simultaneously with the issuance of this decision.