"BD," an infant child with autism, by his mother and guardian, JEAN DOE, "DD," an infant child with autism, by his mother and guardian, Jane Doe, "AA," an infant child with autism, by his mother and guardian, Jane Roe, "JJ" and "LL," infant children with autism, by their mother and guardian, Jeanette Collins, Plaintiffs,

v.

Barbara A. DeBUONO, George Difernando, Geraldine Bunn, Donna Noyes, Susanne D. Kaplan, Patsy Yang–Lewis, Harold N. Adel, M.D., Mark S. Rapaport, M.D., the Westchester County Department of Health, the County of Westches-

ter, Neal L. Cohen, M.D., Lorraine Chung NG, Sandra Ginsberg, Judy Davidson, the New York City Department of Mental Health, Mental Retardation and Alcoholism Services, and the City of New York, Defendants.

"MM," an infant child with autism, by his father and guardian, Gary S. Mayerson, Plaintiffs,

v.

Susanne D. Kaplan, Patsy Yang–Lewis, Harold N. Adel, M.D., Mark S. Rapaport, M.D., the Westchester County Department of Health, the County of Westchester, Barbara A. Debuono, George Difernando, Geraldine Bunn, and Donna Noyes, Defendants.

Nos. 98 CIV. 910(CM)(MDF), 98 CIV. 972(CM)(MDF).

United States District Court, S.D. New York.

Feb. 28, 2000.

Order Denying Reconsideration May 1, 2000.

---

4. This refers to the *Affidavit of Timothy M. Botti,* Exhibit E, *Kravitz Aff.*

Jay W. Eisenhofer, Grant & Eisenhofer, Wilmington, DE, for Plaintiffs.

Robert E. DeRight, Jr., Epstein, Becker & Green, New York, Kyle C. McGovern, Westchester County Attorney's Office, White Plains, for County Defendants.

Thomas Sofield, New York State Attorney General's Office, New York, for State Defendants.

MEMORANDUM DECISION AND ORDER DENYING COUNTY DEFENDANTS' MOTION FOR DECLARATORY JUDGMENT, GRANTING PLAINTIFF AA'S MOTION FOR VOLUNTARY DISMISSAL, DENYING STATE DEFENDANTS' MOTION TO SEVER, GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION IN LIMINE, GRANTING IN PART AND DENYING IN PART COUNTY DEFENDANTS' MOTION IN LIMINE, AND GRANTING PLAINTIFFS' MOTION TO CONSOLIDATE

McMAHON, District Judge.

Plaintiffs "MM", and in a companion case, "BD," "DD," "AA," "JJ," and "LL," all children with autism or pervasive developmental disorder ("PDD"), by their parents and guardians, brought claims against the Westchester County Department of Health ("WCDOH"), several WCDOH officials ("the

County Defendants"), the New York State Department of Health ("NYSDOH") and several of its officials ("the State Defendants"), and the New York City Department of Mental Health ("NYCDOMH") and several of its officials under 42 U.S.C. § 1983 and the Rehabilitation Act of 1973, 29 U.S.C. § 794, *et seq.*, arising out of the alleged adoption by the WCDOH of a policy limiting a particular therapy for the treatment of autism and PDD. The County Defendants have also asserted a cross-claim against the State of New York for costs and indemnification.

Before the Court are the following motions: (1) the County Defendants' Motion for a Declaratory Judgment that the State of New York is the real party in interest and a defendant in this action; (2) Motion for Voluntary Dismissal without Prejudice by Plaintiffs AA and AA's mother, Jane Roe; (3) the State Defendants' Motion to Sever the County Defendants' cross-claim from the present action; (4) Plaintiffs' Motion in Limine; (5) the County Defendants' Motion in Limine; and (6) Plaintiffs' Motion to Consolidate new actions against the WCDOH by Plaintiffs EE, PP, and SS with the present action. Each is considered in turn.

*Background*

Plaintiffs have brought claims against the County, State, and City Defendants under (1) Section 1983 for violations of what they contend is their due process right to individualized treatment plans to address their disabilities, guaranteed to them through the Individuals with Disabilities Education Act, 20 U.S.C. § 1431 *et seq.* ("IDEA"), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.*, New York Public Health Law § 2540 *et seq.*, and the Fifth and Fourteenth Amendments to the U.S. Constitution; and (2) the Rehabilitation Act for violation of that statute's prohibition against discrimination in federally funded programs.

Specifically, Plaintiffs allege that the County Defendants unlawfully implemented policies to prevent, discourage, and limit the use of 1:1 Applied Behavior Analysis Therapy ("ABA Therapy") in the treatment of autistic/PDD children, and that through those policies, Plaintiffs were deprived of needed ABA therapy. Plaintiffs further allege that the

State Defendants deliberately failed to enforce the above laws in violation of their legal obligation under the IDEA, thereby permitting the unlawful actions of the County Defendants. Plaintiffs seek a Declaratory Judgment that the acts of the County and State Defendants were unlawful and violated the U.S. Constitution, IDEA, and Rehabilitation Act, compensatory and punitive damages, including damages for remedial treatment required by Plaintiffs, and costs and attorneys fees.

The parties have brought a number of procedural motions, which are dealt with below.

*County Defendants' Motion for Declaratory Judgment*

In order to qualify for federal funding, the IDEA requires each state to establish a statewide system providing early intervention services to all infants and toddlers with disabilities and their families. *See* 20 U.S.C. § 1434. Each statewide system must include, *inter alia*, an individualized family service plan ("IFSP") for each infant and toddler in the state and coordination of services in accordance with the IFSP. *See id.* § 1436. The IDEA further requires that such system be administered, supervised, and monitored by a "lead agency." *See id.* § 1435(10)(A). The lead agency in New York is the NYSDOH. *See* New York Public Health Law § 2541(12).

On March 15, 1999, the County Defendants filed a cross-claim for their defense costs and indemnification on the ground that "to the extent that the allegations [in the complaint] are based upon the State of New York's mandate that the County of Westchester provide these services and that the State of New York is the lead agency under the IDEA, the State of New York is the party ultimately responsible for the provision of early intervention services as required under the IDEA." (County Defs.' Answer and Cross–Claim, attached as Exhs. C and D to County Defendants' Notice of Motion.) The County Defendants state in their brief that the New York State Attorney General's Office has informed them that it plans to file a motion to dismiss their cross-claim based, at least in

part, on the fact that the State of New York was not named as a party in the suit. They therefore seek a declaratory judgment that the State, rather than the individual State Defendants DeBuono, DiFernando, Bunn, and Noyes (to the extent that they have been sued in their official capacities), is the real party in interest in this action. In the alternative, the County Defendants seek leave of court to amend their Complaint to name the State as a defendant.

■ Their motion, however, is unnecessary, as suits against state officials in their official capacities are to be treated as suits against the State. *See Hafer v. Melo*, 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991) (citing *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)). Hence, the State of New York, by virtue of the claims brought against Defendants DeBuono, DiFernando, Bunn, and Noyes, in their official capacities, is already a *de facto* party to this action. The County's motion is therefore denied as moot.

Of course, Plaintiffs have also asserted claims against the above-named State Defendants in their individual capacities. DeBuono, DiFernando, Bunn, and Noyes are therefore parties in this action as individuals.

As for the issue that this motion raises *sub silentio*—whether the County can be forced to pay for the services in question via a so-called "unfunded mandate"—resolution will have to await the trial. The Attorney General did indicate at one point his intention to file a motion to dismiss the cross-claim, but he has not so moved. The Court will entertain briefing on the legal issue that underlies the cross-claim in advance of trial.

*AA's Motion for Voluntary Dismissal*

On August 20, 1999, Jane Roe, the mother of Plaintiff AA, filed a motion for voluntary dismissal without prejudice pursuant to Fed. R.Civ.P. 41(a)(2). She asserts that AA's condition has improved. Consequently, Roe does not wish to disclose any information relevant to AA's schooling and related activities.

The County Defendants oppose voluntary dismissal for the following reasons: (1) the case has been pending since February 1998; (2) there have already been two motions decided in the case (for change of venue and class certification) into which the County Defendants have put considerable time and effort preparing and arguing; (3) at the time of AA's motion, discovery was "all but complete" (only the depositions of expert witnesses remained before discovery was to close on September 15 of last year); (4) AA waited for over sixteen months from the commencement of the action to move for voluntary dismissal despite her acknowledgment at her deposition that AA's condition has been improving since 1995 and that the child has been in a mainstream educational class since moving to New York City in the fall of 1997 (attached as Exhibit A to Affidavit of Kyle McGovern in Opposition to AA's Motion); and (5) because Roe was aware of AA's improvement prior to bringing suit, the inclusion of Roe and AA in the present action was "vexatious" in that it was motivated by the need for a named plaintiff who could represent children who entered the program via the Family Court (as opposed to the Early Intervention Program) for the purposes of Plaintiffs' failed class action motion. The County Defendants have also moved for attorneys' fees in the event that AA's motion is granted.

■ Although voluntary dismissal under Rule 41(a)(2) is not available as of right, "the presumption in this circuit is that a court should grant a dismissal pursuant to 41(a)(2) absent a showing that defendants will suffer substantial prejudice as a result." *Guzman v. Hazemag U.S.A., Inc.*, 145 F.R.D. 308, 309 (E.D.N.Y.1993). Thus, the focus of the analysis on a motion for voluntary dismissal is the prejudice to the defendant. *See* 9 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2364 at 279–80 (2d ed.1994). Factors relevant to this analysis are (1) the plaintiff's diligence in bringing the motion; (2) any "undue vexatiousness" on the plaintiff's part; (3) the extent to which the suit has progressed, including the defendant's effort and expense in preparation for trial; (4) the duplicative expense of another litigation; and (5) the adequacy of the plaintiff's explanation for the need to dismiss. *See Zagano v. Fordham*

*Univ.*, 900 F.2d 12, 14 (2d Cir.1990), *aff'd en banc*, 900 F.2d 12, 15–16 (2d Cir.1990), *cert. denied*, 498 U.S. 899, 111 S.Ct. 255, 112 L.Ed.2d 213 (1990).

The County Defendants rely heavily on *Zagano*. In that case, the plaintiff had brought employment discrimination claims against the defendant university. Prior to her motion for voluntary dismissal under Rule 41(a)(2), both parties pursued discovery and appeared for a number of pretrial conferences before the court. *See id.* at 13. In the meantime, two witnesses who had played roles in the denial of the plaintiff's reappointment had died, and two others were in poor health. In addition, the New York State Division of Human Rights ("SDHR") had found probable cause that discrimination had occurred, and a hearing on the merits had begun before the SDHR. *See id.* At a pretrial conference held one month before the close of discovery, the plaintiff's attorney stated to the court his intention to pursue the federal action. Nine days before the scheduled trial date, the plaintiff moved for voluntary dismissal on the grounds that she had brought her Title VII action "inadvertently" because she had not understood that issuance of a right-to-sue letter would terminate the EEOC's administrative proceedings, her counsel preferred the SDHR as a forum because he considered the settlement prospects to be more promising before it, and her counsel was too elderly and lacked adequate experience to conduct both the SDHR hearing and the federal trial. *See id.* The Second Circuit upheld denial of her motion as having been made "far too late," noting that the action had been pending for over four years, during which time it was "contested vigorously" by both parties, extensive discovery had taken place, a trial date had been set, and the motion had been brought only days before trial was to begin. *See id.* at 14.

■ On some grounds, this case is distinguishable from *Zagano*. First, the duration of this case—sixteen months as of the date AA's motion was filed—is significantly short-er than the four years during which *Zagano* was pending. Second, AA's brief points out—and the County Defendants have not disputed—that the discovery and pre-trial activity in this case has been more or less identical for all of the six plaintiffs in this case. It has concentrated on refuting the general allegation that Westchester County had in place an illegal policy, custom or practice limiting or prohibiting ABA therapy to eligible children in the County's Early Intervention Program. The only discovery that has been specific to AA involved documents and related information regarding the early intervention services provided to AA. The five remaining plaintiffs will make use of the discovery conducted in the name of all six original plaintiffs. Thus, whatever resources have been expended by the County Defendants will not have been wasted. *See Allen v. Indeck Corinth Ltd. Partnership*, 161 F.R.D. 233, 236 (N.D.N.Y.1995) (observing that defendants' effort and expense in trial preparation would not be wasted where several plaintiffs remained in action). Finally, in contrast to *Zagano*, no trial date has yet been set (although the case is trial ready).

There are, of course, countervailing considerations. Roe can hardly be said to have exercised diligence in bringing her motion, which was filed more than 16 months after the complaint in the BD action, and at the trial-ready stage. Moreover, while I find her explanation of her wish to dismiss (i.e., her desire to maintain the privacy of AA's schooling and related activities) compelling, I note that AA would be forced to disclose such details were she to reinitiate her claim at a later stage. And the County would suffer some modest duplication of expenses if AA were to bring suit after the trial in this action concluded.[1]

■ However, I find that the overall circumstances favor granting AA's motion for dismissal without prejudice. In particular, the possibility that a dismissed plaintiff will refile her action cannot be deemed "substantial prejudice." *See Louis v. Bache Group*,

---

1. To the extent that AA's situation differs from that of the other Plaintiffs, in that AA entered the program in a different manner, denying AA's motion might introduce at trial a whole set of issues it will not be necessary for the jury to address. This weighs in favor of granting the motion.

*Inc.,* 92 F.R.D. 459, 460 (S.D.N.Y.1981). Otherwise, no action could ever be dismissed without prejudice.

The County Defendants have also moved for attorneys' fees and costs should AA's motion be granted. Rule 41(a)(2) allows a court to condition voluntary dismissal "upon such terms and conditions as the court deems proper," including an award for fees and costs. *See The Gap, Inc. v. Stone Int'l Trading, Inc.,* 169 F.R.D. 584, 588 (S.D.N.Y. 1997), *aff'd,* 125 F.3d 845 (2d Cir.1997). The purpose of such an award under Rule 41(a)(2) is to reimburse the defendant for costs incurred, in light of the risk that the defendant will be forced to litigate the same suit anew and shoulder the burden of duplicative expenses. *See Colombrito v. Kelly,* 764 F.2d 122, 134 (2d Cir.1985). However, fees and costs are to be awarded only "when justice so demands." *See The Gap,* 169 F.R.D. at 588. Courts within this circuit have refused to award fees and costs following a Rule 41(a)(2) dismissal absent circumstances evincing bad faith or vexatiousness on the part of the plaintiff. *See, e.g., Succession Picasso v. Spedding,* No. 96 Civ. 4546, 1997 WL 65911, *3 (S.D.N.Y. Feb. 13, 1997); *The Gap,* 169 F.R.D. at 588; *In re Shavit,* 197 B.R. 763, 771 (Bankr.S.D.N.Y.1996). There has been no such showing in the present case.

Moreover, any concern that the County Defendants will face duplicative expenses in a second action is minimized by the fact that the issues and discovery in this case have been essentially the same as to all Plaintiffs. The County Defendants can use the same preparation and expense they have undertaken in this case in a subsequent action. *See Westlands Water Dist. v. United States,* 100 F.3d 94, 97 (9th Cir.1996) (stating that defendants "should only be awarded fees for work which cannot be used in any future litigation of these claims" following voluntary dismissal under Rule 41(a)(2)); *c.f. Belkow v. Celotex Corp.,* 722 F.Supp. 1547, 1553 (N.D.Ill.1989) (noting that where other claims remained in action after Rule 41(a)(2) dismissal, "[a]ny work product defendant has generated is not wasted but useful and relevant to the rest of the litigation").

Accordingly, the County's application for an award of attorneys' fees and costs is denied.

### State Defendants' Motion to Sever County Defendants' Cross–Claim

The State Defendants have moved to sever the County's cross-claim against the State of New York from this action, pursuant to Fed. R.Civ.P. 42(b), which provides:

> Separate Trials. The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues, always preserving inviolate the right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States.

The decision whether to grant a motion for severance is within the broad discretion of the district court. *See Smith v. Lightning Bolt Productions, Inc.,* 861 F.2d 363, 370 (2d Cir.1988). Factors to be considered by the court on such a motion include: (1) whether the issues sought to be tried separately are significantly different from one another; (2) whether the severable issues require the testimony of different witnesses and different documentary proof; (3) whether the party opposing the severance will be prejudiced if it is granted; and (4) whether the party requesting the severance will be prejudiced if it is not granted. *See German v. Federal Home Loan Mortgage Corp.,* 896 F.Supp. 1385, 1400 (S.D.N.Y.1995), *decision clarified on reargument,* 896 F.Supp. 1385 (1995).

With respect to the first of these factors, the State Defendants argue that judicial economy would best be served by severing the two claims, because the primary issue raised by Plaintiffs' claims against the State—i.e., the State's failure to properly monitor and investigate the County Defendants as required by the IDEA—differs from the issue in the cross-claim, namely, whether the State bears ultimate financial responsibil-

ity for the misfeasance of the County Defendants. This argument, however, broadens the term "different claims" beyond its meaning for the purposes of Rule 42(b). Courts analyzing this factor have determined that severance is not appropriate where the claims to be severed arise out of the same transaction or series of transactions, on the rationale that the result would be duplicative litigation. *See Cashman v. Montefiore Medical Center,* 191 B.R. 558, 562–63 (S.D.N.Y. 1996) (judicial economy did not weigh in favor of severance of third-party products liability claim from medical malpractice action stemming from silicone implants); *Streeter v. Joint Indus. Bd. of Electrical Indus.,* 767 F.Supp. 520, 529 (S.D.N.Y.1991) (severance of discriminatory discharge claims from hostile environment claims denied where claims arose out of same series of discriminatory actions); *Levine v. Federal Deposit Ins. Corp.,* 136 F.R.D. 544, 550 (D.Conn.1991) (severance of claim against receiver for wrongful transfer of stock denied where defendants alleged to have taken part in same wrongful transfer). Here, Plaintiffs' claims and the County Defendants' cross-claim similarly arise from a common factual occurrence—the NYSDOH's alleged failure to comply with the requirements of its status as a "lead agency" under the IDEA. Thus, the first factor of the severance test does not favor the State Defendants' motion.

Moreover, courts take a dim view of severance where a risk of inconsistent verdicts is present, as in this case, where one fact-finder might conclude that the State bears full responsibility, while the other determines that the County is the sole liable entity. *See Cashman,* 191 B.R. at 563; *Foremost Guaranty Corp. v. Public Equities Corp.,* No. 86 Civ. 6421, 1988 WL 125667, *6 (S.D.N.Y. Nov. 10, 1988). In this regard as well, consideration for judicial economy suggests that severance is not appropriate.

Next, I must determine whether the trial on these issues requires sufficiently different testimony and documentary evidence. As the County Defendants point out, both claims involve the common question of the State's obligations to the Plaintiffs and the County as the "lead agency" in New York. The par-

ties agree that the underlying question is one of law that will have to be decided by the Court. Should I decide that the County can pursue its claim as a matter of law, the evidence that will be adduced on both Plaintiffs' claim and the cross-claim will be directed to the State's legal obligations under the statute, including providing assistance, guidance, and technical training to local agencies that are charged with administration of the State's early intervention duties. Severance of the claims would require a presentation of some evidence twice, which weighs against severance. *See Corrigan v. Methodist Hosp.,* 160 F.R.D. 55 (E.D.Pa.1995) (severance denied where, *inter alia,* evidence and witnesses largely the same).

The third and fourth factors ask whether either party will be prejudiced: the moving party by a joint trial, and the opposing party by a separate trial. The County Defendants argue that they will suffer such prejudice if they are not afforded the same fact-finder for the purpose of apportioning liability on both claims, and the State Defendants contend that the jury will be confused by the differing obligations of the County and State under the IDEA. However, as discussed below, the cross-claim will not be tried to a jury, but to the Court. Therefore, these factors fall away in the analysis.

The State Defendants contend that the County Defendants have waived their right to a jury trial on their cross-claim because they failed to include a jury demand in their Answer and Cross–Claim in accordance with Fed.R.Civ.P. 38. Rule 38 provides in pertinent part:

(a) Right Preserved. The right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States shall be preserved to the parties inviolate.

(b) Demand. Any party may demand a trial by jury of any issue triable of right by a jury by (1) serving upon the other parties a demand therefor in writing at any time after the commencement of the action and not later than 10 days after the service of the last pleading directed to such issue, and (2) filing the demand as required by Rule 5(d).

(c) Same: Specification of Issues. In the demand a party may specify the issues which the party wishes so tried; otherwise the party shall be deemed to have demanded trial by jury for all the issues so triable.

(d) Waiver. The failure of a party to serve and file a demand as required by this rule constitutes a waiver by the party of trial by jury.

The controlling case law indicates that a party asserting a cross-claim for indemnification under the circumstances present here may not rely on a general jury demand made in the main action. The leading case on the question in this Circuit is *Rosen v. Dick*, 639 F.2d 82 (2d Cir.1980). In that case, the Second Circuit rejected the contention that a timely general jury demand by the plaintiff automatically secures to all parties the right to jury trial of all the issues of fact in the action. Judge Tenney, construing the language of Rule 38, noted that the first sentence of subsection (c) "gives each party discretion to demand a jury as to some or all of the issues affecting that party," while the second sentence "allows other parties to assert the jury right as to any issues, *with which they are connected*, which were excluded from the initial demand" (emphasis added). *See id.* at 91. The Court in turn determined that the term "issue" under that subsection is broad enough to encompass "the basic legal theory" and "the character of the suit." *See id.* at 96.

Turning to the present case, Plaintiffs' allegations against the County Defendants can be summarized as follows: the County Defendants maintained a policy or practice of limiting the availability of Applied Behavior Analysis therapy to ten hours per week per child; failed to properly train, supervise and discipline Defendant Susanne Kaplan, the Director of Westchester County's Early Intervention Program; failed to prevent implementation of the policy limiting required therapy; adopted or ratified such policy; allowed Defendant Kaplan to perjure herself in connection with a memorandum describing the WCDOH's practice or policy; made misrepresentations of fact to the New York State Department of Health upon the NYSDOH's investigation; and made further representations to the media designed to conceal its policy from the public, all in violation of the IDEA, Rehabilitation Act, and Fifth and Fourteenth Amendments. (BD Cplt. ¶¶ 69–75; MM Amended Cplt. ¶¶ 84, 97.) The County's cross-claim, by contrast, alleges that "[t]o the extent that the allegations are based upon the State of New York's mandate that the County of Westchester provide [the needed therapy] and that the State of New York is the lead agency under the IDEA, the State of New York is the party ultimately responsible for the provision of early intervention services as set forth under the IDEA." (County Ans. and Cross–Claim ¶ 165.)

Under the analysis in *Rosen*, the claims in this case are sufficiently distinguishable to preclude reliance by the County on the complaint's general jury demand. Plaintiff's claims all rest upon the legal theory that the County and City Defendants failed to provide ABA therapy in adequate amounts, and that the State Defendants knew about those failures but failed to take remedial action and neglected to duly investigate a complaint made to the NYSDOH. The County's cross-claim against the State, on the other hand, centers upon the question of who will ultimately have to pay for the provision of early intervention services—a hotly debated political issue in New York State generally, and especially here in Westchester County, but one that has nothing to do with Plaintiffs' allegations.

The County argues that the issue raised by its cross-claim is merely a component of the allegation in Plaintiffs' Complaint against the State that the State's legal responsibilities include "all agencies, institutions and organizations providing early intervention services in the State of New York, including monitoring those entities, enforcing all obligations imposed by the IDEA Statute on those entities" and "providing technical training and assistance to those entities and correcting any deficiencies found to exist in those entities." (MM Amended Cmplt. ¶ 38.) In other words, the County asserts that the question of the State's duties pursuant to the IDEA underlies both Plaintiffs' claims against the State and the County's cross-claim, such that

the County is entitled to rely on the Plaintiffs' jury demand.

But the questions posed by the two claims are more nuanced than the County suggests. Whereas Plaintiffs' claim against the State implicates the NYSDOH's duty to oversee the operations of county agencies providing early intervention programs under the IDEA, the County's cross-claim for contribution is addressed to the allocation of legal responsibility between it and the State under that statute—that is, whether the County is to bear any liability at all under the IDEA for the WCDOH's alleged failure to tailor the administration of its early intervention therapy to the individual needs of the infant Plaintiffs.

■■ While the two questions arise from common facts, "the fact that the issues share some factual components is not sufficient for them to be deemed 'the same issue' for purposes of a jury demand." *See Davidson Pipe Co. v. Laventhol & Horwath,* 125 F.R.D. 363, 367 (S.D.N.Y.1989). "[I]t is not sufficient merely to label various parties joint tortfeasors and then assert that all issues between them are subject to a general jury demand." *Id.* at 368 (citing *Rosen,* 639 F.2d at 99). *See also In re N–500L Cases,* 691 F.2d 15, 24 (1st Cir.1982) (contribution claims by non-settling defendants in air crash litigation not sufficiently related to plaintiffs' claim for defendants to rely on plaintiffs' jury demand); *Davidson Pipe,* 125 F.R.D. at 367 (jury trial in securities fraud case waived where defendants failed to make demand in contribution claim against law firm that represented investors); *Sound Video Unlimited, Inc. v. Video Shack, Inc.,* 700 F.Supp. 127, 145 (S.D.N.Y.1988) (defendant not permitted to rely on plaintiff's general jury demand included in complaint alleging fraud and breach of fiduciary duty arising out of aborted merger where defendant counterclaimed for illegal wiretapping).

Although this may seem a harsh result for a technical oversight on the County's part, as the Second Circuit admonished in *Rosen,* "we are unwilling to dispense with the technical requirements of Rule 38, especially when they are so easy to follow and when allowing less than technical compliance threatens to entangle the courts routinely in slippery factual inquiries where the Rule contemplates only a single procedural inquiry .... [W]e will urge that in the future the parties to complex litigation be more careful in protecting their jury trial rights and in sparing the courts and themselves avoidable expense, effort and delay by expressing their intentions clearly and in a timely fashion." *Rosen,* 639 F.2d at 100.

■■ The County Defendants' waiver, the State Defendants argue, weighs in favor of severance because of the inconvenience the Court would face in conducting a jury trial for Plaintiffs' claims and a bench trial for the County's cross-claim. The State Defendants correctly note that the prospect of a mixed jury-bench trial may be a factor supporting severance. *See Sound Video,* 700 F.Supp. at 146. On balance, however, the general overlap of witnesses and other evidence, together with the lack of prejudice to either party, indicates that severance is not appropriate in this case. Indeed, the Court would be prejudiced by having to endure this trial twice. The State's motion is therefore denied.

*Plaintiffs' Motion in Limine*

On October 26, 1999, Plaintiffs filed a Motion in Limine to exclude three spreadsheets offered by the County, CDX–168 (as well as SDX–22, which is the same spreadsheet as offered by the State) and CDX–169, both of which contain data compiled from WCDOH case files, and SDX–34, an abbreviated version of those spreadsheets. Plaintiffs state that the County Defendants notified them by letter dated November 10, 1999 that the County has decided not to introduce the spreadsheets into evidence. Plaintiffs claim that a ruling on their Motion in Limine with respect to the spreadsheets is still necessary, however, because the State Defendants may still offer them into evidence.

On December 2, Plaintiffs filed an Amended Motion in Limine to further exclude (1) 144 case files, collectively denominated CDX–167, from which CDX–168 and CDX–169 were created, (2) any testimony by the County Defendants regarding the information that appears in the spreadsheets, and (3) that

portion of the report of the County Defendants' expert, Dr. Frank Gresham, referring to CDX–167, –168, and/or –169, and the exclusion of any trial testimony by Dr. Gresham with respect to the files and spreadsheets.

### (1) CDX–168, CDX–169 and SDX–34

Plaintiffs moved to exclude these spreadsheets in their original Motion in Limine. CDX–168 was created by the County Defendants in response to Plaintiffs' second interrogatories, which sought information for every child in WCDOH case files diagnosed with, or exhibiting behaviors of, autism or PDD. In response, the County Defendants provided a spreadsheet composed of data taken from selected documents in 146 case files.

The documents in the case files on which the CDX–168 spreadsheet was based included individualized family service plans ("IFSPs"), amendments to IFSPs, and service coordinator notes. In most cases, the documents were prepared by the service coordinator (or "EIOD") responsible for the file and include information that the service coordinator obtained from others. The spreadsheet includes the following columns: child ID number; child date of birth; date referred to early intervention; EIOD or service coordinator; date of IFSP; date of amendment to IFSP; special education received (with columns captioned "ABA Home," "ABA Center," "non-ABA Home," and "non-ABA Center"); family training (with columns "ABA" and "non-ABA"); collateral ("ABA" and "non-ABA"); speech; occupational therapy; physical therapy; other; total number of ABA hours per week; and total number of early intervention services per week. (CDX–168, attached as Exhibit A to Plaintiffs' Notice of Motion in Limine.)

At some point during discovery, Magistrate Judge Fox authorized the deposition of Lorraine Chun, a WCDOH employee claimed by the County Defendants to have knowledge of the preparation of the spreadsheet. Ms. Chun testified that the spreadsheet was prepared by a number of WCDOH employees under her direction, that she had no personal knowledge concerning the information contained in the spreadsheet, and that she was instructed by counsel as to how the information should appear on CDX–168. (Deposition of Lorraine Chun at 96–102, attached as Exhibit C to Plaintiffs' Notice of Motion in Limine.)

CDX–169 is a revised version of CDX–168. The revisions consist of handwritten and typewritten additions to the first spreadsheet. Plaintiffs claim that the County Defendants provided no explanation of the changes in CDX–169, but that the revisions appear to relate in part to errors in CDX–168 brought to light during Ms. Chun's deposition. (CDX–169, attached as Exhibit B to Plaintiffs' Notice of Motion in Limine.)

Plaintiffs first argue that these two spreadsheets are inadmissible hearsay, offered to prove the truth of the assertion for which they are offered—i.e., that the County did not have a policy, custom, or practice limiting ABA therapy to 10 hours per week. Because the information provided in the spreadsheets was compiled from notes, reports, and other documents, Plaintiffs argue, the spreadsheets are hearsay within hearsay. They further claim that the spreadsheets fail to satisfy the business record exception under Fed.R.Evid. 803(6). Plaintiffs are correct that the spreadsheets constitute hearsay that does not qualify under the business records exception. Ms. Chun testified that the spreadsheets were produced at the direction of counsel, not in the ordinary course of business, and they therefore do not constitute business records for purposes of Rule 803(6).

The spreadsheets may be admissible, however, as summaries under Rule 1006, which provides that "[t]he contents of voluminous writings, recordings, or photographs which cannot be conveniently examined in court may be presented in the form of a chart, summary, or calculation." At first blush, it appears that the case files are business records, and therefore, independently admissible. Therefore, Rule 1006 can come into play. As Plaintiffs observe, summary evidence is admissible only if the underlying documents upon which the summary is based are also admissible. *See United States v.*

*Manshul Constr. Corp.,* No. 93 Civ. 0308, 1996 WL 267945, *5 (S.D.N.Y. May 20, 1996).

Plaintiffs assert that the case files from which the data in CDX–168 and –169 are based lack sufficient trustworthiness to be admissible as business records on the grounds that (1) different service coordinators record information in different ways, such that the files contain differing degrees of specificity, leading to confusion and uncertainty about what services were provided; (2) the case files contain multiple hearsay because they reference and rely on the statements of third parties made to the filekeeper, with no guarantee of the statements' accuracy; and (3) although the case files were created at or around the time of the events recorded, by persons having some responsibility for the files, only redacted versions of the case files were produced in discovery, according to Judge Fox's ruling. (Transcript of Conference before Hon. Mark D. Fox, July 8, 1999, at 5–10, attached as Exhibit B to Declaration of Denise DiPersio in support of Plaintiffs' Amended Motion in Limine.) Hence, Plaintiffs argue that information tending to show that there was an illegal policy, custom or practice—for example, that a child received more than ten hours of ABA therapy only because the parent insisted—is not included in those documents. Assuming, however, that the individuals who made the entries in the underlying documents did so contemporaneously and under a business duty, Plaintiffs' concerns are unwarranted. The spreadsheets will therefore be admitted into evidence under Rule 1006, provided that the County Defendants can establish that the underlying documents were compiled pursuant to a business duty at or near the time the statements they contain were made.

 Apart from the trustworthiness of the underlying case files, Plaintiffs have provided evidence that the spreadsheets themselves contain several inaccuracies. Specifically, Ms. Chun conceded at her deposition that at least 25 of the entries on CDX–168 included incorrect dates, hours recorded for services for which there is no support in the underlying files, hours approved that are not reflected on the spreadsheet, mistakes carried over from the underlying files, errors

of interpretation, or errors in the computation of total hours of services provided. (See Chun Dep. at 201, 204, 225, 226, 244, 245, 248, 249, 256, 261, 265, 266, 269, 272, 273, 279, 280, 285, 287, 293, 295, 296, 310, 315, 317, 319, 322.) The inaccuracy of a summary under Rule 1006, however, goes to the weight, rather than the admissibility, of the evidence. *See In re Richardson–Merrell, Inc. "Bendectin" Prods. Liab. Litig.,* 624 F.Supp. 1212, 1224–1226 (S.D.Ohio 1985), *aff'd,* 857 F.2d 290 (6th Cir.1988), *cert. denied,* 488 U.S. 1006, 109 S.Ct. 788, 102 L.Ed.2d 779 (1989). An inaccurate summary may be admitted where accompanied by limiting instructions ensuring that the summary's limitations are placed in "proper perspective." *See United States v. Nivica,* 887 F.2d 1110, 1125 (1st Cir.1989), *cert. denied,* 494 U.S. 1005, 110 S.Ct. 1300, 108 L.Ed.2d 477 (1990). Moreover, according to Plaintiffs, CDX–169 is a corrected version of CDX–168. (The County has neither briefed nor offered any evidence on this issue.) If the County is able to establish that the changes to CDX–169 actually corrected the errors in CDX–168, the need for a limiting instruction will be obviated.

Finally, Plaintiffs argue that the spreadsheets should be excluded as unduly prejudicial under Rule 403. They claim that the spreadsheets will carry "an aura of respectability" because they were prepared on the basis of County records that the average juror is likely to accept as accurate. Plaintiffs cite for this argument *United States v. Citron,* 783 F.2d 307, 316 (2d Cir.1986) (unless chart "fairly" represents and summarizes underlying evidence, "the chart is more likely to confuse or mislead the jury than it is to assist it"), and *In re Air Crash Disaster at John F. Kennedy Int'l Airport on June 24, 1975,* 635 F.2d 67, 73 (2d Cir.1980) (chart comparing established glide path with plane's actual glide path inadmissible as potentially misleading where it did not accurately depict actual events). Plaintiffs contend that admitting the case files will unduly prejudice them because they will be forced to engage in lengthy rebuttal, including tangential issues relating to the creation and maintenance of the case files, the service coordinators responsible for the files, and the manner in

which information is recorded in the files. Additionally, they argue that the incompleteness of the files means that no rebuttal can compensate for missing information.

I reject these arguments. As observed above, any inaccuracies in the summaries can be remedied by way of a limiting instruction, and thus, there is little force to Plaintiffs' concern over the prospect of digressing along various "tangents." As for the specter of lengthy digressions, the Court will ensure that they are limited in time and scope.

For the above reasons, CDX–168 and –169 will be admitted at trial.

The State Defendants have also offered SDX–34, a spreadsheet created by the County Defendants prior to CDX–168 and –169. SDX–34 was originally withheld from production by the County Defendants on privilege grounds, but Judge Fox overruled their objection. According to Plaintiffs, the State Defendants are relying on SDX–34 because it contains the names of service providers, information not included in CDX–168 and –169. Plaintiffs cite the testimony of Ms. Chun that SDX–34 is less complete than CDX–168 and that she was unable to vouch for the information in SDX–34. (Chun Dep. at 147–54.) They further argue that SDX–34 constitutes inadmissible hearsay for the same reasons they raised with respect to CDX–168 and –169.

Ms. Chun's testimony establishes that SDX–34 is not a business record, and that it in some respects duplicates the more complete CDX–168 and –169. Accordingly, SDX–34 is not needed and will not be admitted at trial.

### (2) CDX–167

CDX–167 consists of selected documents from 144 case files, specifically, IFSPs, amendments to IFSPs, and service coordinator notes. Most of the documents in each file were prepared by the service coordinator responsible for the file, and include information that the service coordinator obtained from third parties such as the child's parents, other County personnel, or independent service providers.

Plaintiffs make the following arguments against admission at trial of CDX–167 and testimony pertinent to it: (1) the information contained in CDX–167 is inadmissible hearsay; (2) the probative value of CDX–167 is substantially outweighed by its prejudicial effect under Rule 403; (3) WCDOH supervisory personnel should not be permitted to testify regarding CDX–167 because they lack personal knowledge of its contents; and (4) admitting CDX–167 would "eviscerate" Judge Fox's ruling that the County Defendants are barred from relying on any case file to which Plaintiffs did not have equal access.

Plaintiffs first argue that CDX–167 constitutes inadmissible hearsay, and fails to satisfy the requirements of the business record and residual hearsay exceptions, for the same reasons they advance in support of exclusion of CDX–168 and –169. Specifically, Plaintiffs contend that the case files of CDX–167 lack the requisite trustworthiness because (1) only portions of the case files have been offered into evidence, so that critical information tending to show that there was an illegal policy, custom or practice—for example, that a child received more than 10 hours of ABA therapy only because the parent insisted—is not included; (2) different service coordinators tend to record information with differing degrees of detail, causing confusion and uncertainty about what services were offered or provided; and (3) the case files contain multiple hearsay because they reference and rely on the statements of third parties made to the record keeper, with no guarantee of the accuracy of those statements.

For the same reasons as discussed above in connection with the files underlying CDX–168 and –169, I conclude that the case files that constitute CDX–167 satisfy the business records exception, again provided that the County Defendants demonstrate that the files were prepared in the ordinary course of business by a person acting under a duty to accurately record the data.

Plaintiffs next argue that admission of CDX–167 would be excessively prejudicial under Rule 403. In support, they repeat the arguments they make in support of exclusion of CDX–168 and –169 under Rule 403, name-

ly: the case files will carry an "aura of respectability" because they are County records, and admitting the files will require lengthy rebuttal evidence in view of the incompleteness of the files, resulting in jury confusion. Again, any prospect of jurors giving undue weight to County files or becoming confused by missing portions can be adequately dealt with through the use of limiting instructions.

Plaintiffs further contend, however, that admitting CDX–167 would conflict with what they describe as Judge Fox's ruling that the County Defendants could not rely upon files to which Plaintiffs did not have equal access. Plaintiffs and the County Defendants engaged in a lengthy discovery dispute over Plaintiffs' access to the records of non-party children in the County's Early Intervention Program. The outcome was a procedure devised by Judge Fox by which Plaintiffs' counsel were permitted to review 144 redacted WCDOH case files and select certain of them as pertinent to this case. Plaintiffs' counsel were not permitted to take notes on, or make copies of, the documents reviewed. The County Defendants then notified the parents whose files had been chosen by counsel, and requested the parents' permission to disclose their identities and release their unredacted files to Plaintiffs. Only 12 families, exclusive of Plaintiffs, consented to release of their files. Judge Fox permitted Plaintiffs to obtain only redacted copies of the documents they had selected from the remaining case files, which did not include the families' names, and thus afforded Plaintiffs no opportunity to contact or depose the family members. For that reason, Judge Fox granted Plaintiffs' request that the County Defendants be prevented from relying on any files at trial to which Plaintiffs did not have equal access. (Transcript of Conference before Judge Fox, attached as Exh. B to DiPersio Dec.)

Plaintiffs now characterize Defendants' attempt to introduce CDX–167 into evidence as an attempt to circumvent Judge Fox's ruling. They argue that the County Defendants are in a superior position because they have all of the files at their disposal, and can call witnesses with personal knowledge about them,

whereas Plaintiffs will be prejudiced by their inability to contact or depose the families named in the files, and will be denied the opportunity to cross-examine those individuals at trial if the files are admitted. Because the discovery procedure Plaintiffs describe was devised by Judge Fox, I refer the question of whether his ruling bars admission of CDX–167 back to Judge Fox (who has volunteered for the assignment) for a Report and Recommendation.

### (3) Testimony Relating to CDX–167, –168, and –169

Plaintiffs next urge the Court to exclude testimony from certain WCDOH supervisors regarding the information in CDX–167, –168 and –169. Plaintiffs request is based on their assumption that CDX–167, –168 and –169 will be excluded, and that the County Defendants will therefore proffer trial testimony with respect to the information contained in the documents from supervisory personnel—specifically, witnesses Kaplan, Strawder, Bovard, and Graubard—who lack personal knowledge of that information, as required by Fed.R.Evid. 602. As such, Plaintiffs argue that those witnesses would merely be transmitting the hearsay contained in the files themselves. Since I have ruled that the spreadsheets and case files are admissible, this eventuality does not appear likely. In either case, Plaintiffs are correct that Rule 602 bars WCDOH personnel from testifying to information in the files about which they do not have personal knowledge.

According to Plaintiffs, however, several of the County Defendants did testify that they were aware of instances where more than 10 hours of ABA therapy was provided in the early intervention program. (Deposition of Susanne Kaplan at 71–72; Deposition of Lorraine Chun at 53, 55; Deposition of Sue Ann Galante at 81, 83; Deposition of Elise Kaplan at 18, 22, 94, 97, attached as Exhibits H–K to DiPersio Dec.) Plaintiffs characterize this testimony as "unsupported and anecdotal." (Pl. Br. in Support of Amended Motion in Limine at 12.) That argument, however, goes to the weight rather than the admissibility of the evidence. Testimony must be admitted if the jury could reasonably con-

clude that the witness perceived the event to which he or she is testifying. *See* 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 602.03[2][a] (Joseph A. McLaughlin, ed., Matthew Bender 2d ed.1997). On the record before me at this stage, I cannot conclude that no rational juror could determine that WCDOH personnel had personal knowledge of the amount of ABA therapy provided to particular children in the Early Intervention Program.

Plaintiffs argue in the alternative that even if the case files are admissible, it would be excessively cumbersome and time-consuming for the County to call the individual service coordinators who prepared each of the 144 case files of CDX–167 to testify about the contents of the files. Neither party has specified the number of recordkeepers who compiled those files, and the witness list in the Joint Pre–Trial Order does not specify job titles. I therefore decline to make a determination at this point on the feasibility of calling each individual service coordinator at trial.

Finally, Plaintiffs argue that to the extent the County Defendants plan on calling the service coordinators who prepared the files, their testimony will be flawed in the same way as the documents themselves—incomplete, confusing, and containing multiple hearsay. I have already rejected Plaintiffs' assertions that the files are inherently unreliable or confusing and constitute hearsay, and I will not make the same conclusion about the testimony of service providers with respect to those files. Plaintiffs will have adequate opportunity at trial to demonstrate the lack of knowledge of County witnesses through cross-examination.

#### (4) Portions of CDX–162 and Related Testimony of County Defendants' Expert

▮ Plaintiffs have moved to exclude the portion of CDX–162—the report of the County Defendants' expert, Dr. Frank Gresham—entitled "Intervention Services Provided by Westchester County"—based on Gresham's testimony that his report was based on his review of the spreadsheets and case files rather than personal knowledge of services provided. Plaintiffs argue that the disputed portion of the report must be excluded on the ground that expert witnesses cannot base their opinions on facts of which they have no first-hand knowledge. Plaintiffs are incorrect on this point. Rule 703 provides that the facts upon which an expert bases an opinion or inference need not be admissible in evidence "[i]f of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Plaintiffs' motion with respect to Dr. Gresham's testimony will therefore be denied if County Defendants can establish that experts in Dr. Gresham's field reasonably rely upon a review of spreadsheets or comparable data in forming opinions on the quality of early intervention services.

Second, Plaintiffs seek to exclude any testimony by Dr. Gresham relating to the portion of CDX–162 that they seek to exclude, or to the spreadsheets and case files. Admission of such testimony, Plaintiffs assert, would amount to admission of otherwise inadmissible hearsay through Dr. Gresham's testimony. As discussed above, the spreadsheets and underlying case files are admissible, as is the report, provided the County makes the requisite showing under Rule 703. For that reason, Plaintiffs' argument fails.

#### County Defendants' Motion In Limine

The County Defendants have also filed a Motion In Limine, asking the Court to do the following: (1) limit the issues at trial to the existence of an illegal policy, whether that policy was applied to Plaintiffs, and whether Plaintiffs were injured as a result; (2) preclude Plaintiffs from introducing into evidence certain videotapes of autistic children as unduly prejudicial; and (3) preclude evidence offered by Plaintiffs BD, MM, and DD on the issue of liability of the County to those Plaintiffs for certain compensatory damages, costs, and attorneys' fees, on the ground that these are not damages for which those Plaintiffs may be compensated.

#### (1) Limitation of Issues at Trial

The County first asks the Court to limit the issues at trial to: (1) whether the County had in place an illegal policy; (2) whether the County implemented that policy in the for-

mulation of the Individual Family Service Plans ("IFSPs") of each Plaintiff; (3) whether such implementation violated the constitutional rights of each Plaintiff; and (4) whether each Plaintiff was injured as a result of that policy. In particular, County Defendants aim to prevent Plaintiffs from raising the question of the efficacy of the particular therapy—ABA—of which Plaintiffs claim to have been deprived, a question that the County Defendants argue is not at issue in this case.

Plaintiffs concede that their claims hinge upon a showing of the existence of an illegal policy of the County, its application to them, and consequent injury, but insist that the evidence on those issues cannot be limited to the County Defendants' actions in the formulation of Plaintiffs' IFSPs. They argue that the entire early intervention experience of Plaintiffs, as well as nonparty children affected by the County's policy, is relevant, reasoning that although the Individual Family Service Plan was one of the ways in which the County Defendants implemented their ten hour policy, the IFSP was not the only, or even the most significant, way. Plaintiffs cite as examples the admission by Defendant Kaplan (Director of the County's Early Intervention Program) in a WCDOH memorandum that she was following a WCDOH policy in limiting ABA therapy to 10 hours per week per child (Pl.Exh. 1), Jean Doe's testimony that she only learned of the existence of ABA therapy from BD's special education teacher after BD's IFSP had been completed and services were being provided (Pl. Exhs.39–43), and Jane Doe's testimony that she was told of the County's ten hour policy only after DD's service plan was in place (Pl.Exh. 2). Confining the issues at trial to the "formulation" of Plaintiffs' IFSPs would unfairly exclude such key evidence, Plaintiffs contend.

Plaintiffs are correct. As the above examples show, the existence of an illegal WCDOH policy is not necessarily limited to the time in which IFSPs were designed, so that an exclusive focus on the "formulation" stage would arbitrarily bar highly probative evidence on that point. The County's request is therefore denied. However, lengthy frolics and detours into cases not on trial will be curtailed.

■ Plaintiffs further argue that they should be permitted to present evidence about the early intervention services offered and/or provided to nonparty children pursuant to Westchester County's policy (as opposed to the identities of those nonparty children, which remain undisclosed as per Judge Fox's ruling), since such evidence will tend to establish a pattern or practice corroborating the existence of a policy. Plaintiffs rely upon Fed.R.Evid. 406, which provides that evidence of the routine practice of an organization is relevant to prove that the conduct of the organization on a particular occasion was in conformity with that routine practice. The Rule is applicable to this case: Plaintiffs seek to introduce evidence that the quantity of ABA services provided to nonparties by an "organization"—the WCDOH—was similar to that provided to Plaintiffs. To that extent, evidence relating to non-parties is admissible. But again, the amount of such evidence will be limited.

■ Plaintiffs next respond that evidence relating to the efficacy of ABA therapy is admissible because it is necessary to their Section 1983 claims against the individual defendants and against all defendants under the Rehabilitation Act. Specifically, Plaintiffs note that a defendant is individually liable under Section 1983 if he or she is "personally involved" in the unconstitutional conduct, either as a supervisor, or as someone who knows about the conduct and demonstrates "gross negligence" or "reckless indifference" to the violation. *See Spencer v. Doe,* 139 F.3d 107, 112 (2d Cir.1998); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *McCann v. Coughlin,* 698 F.2d 112, 125 (2d Cir.1983). Similarly, the Rehabilitation Act requires a plaintiff to demonstrate bad faith or gross misjudgment before a violation can be made out in the context of education of handicapped children. *See Monahan v. State of Nebraska,* 687 F.2d 1164 (8th Cir.1982), *cert. denied,* 460 U.S. 1012, 103 S.Ct. 1252, 75 L.Ed.2d 481 (1983), *on remand,* 575 F.Supp. 132 (D.Neb.1983).

Here, Plaintiffs contend that the effectiveness of the treatment is relevant to the motivation and intent of the County Defendants in formulating and implementing their 10 hour policy, in view of the County Defendants' awareness of the benefits of ABA therapy (which Plaintiffs claim is demonstrated by the presence in WCDOH files of two studies indicating those benefits and revealing that children who received only 10 hours of ABA therapy made no appreciable progress). In other words, Plaintiffs are arguing that evidence of the benefits of ABA, and of County Defendants' knowledge of those benefits and subsequent failure to offer the therapy for more than 10 hours per week, go directly to Plaintiffs' claims of gross negligence and reckless indifference under Section 1983 and the Rehabilitation Act. I agree with Plaintiffs. Knowledge on the part of WCDOH supervisors that 10 hours per week of ABA therapy was inadequate, followed by a decision of those supervisors to limit ABA therapy to 10 hours despite that knowledge, is evidence tending to show gross negligence or reckless indifference on the part of the County Defendants. Accordingly, evidence of the effectiveness of ABA is admissible for that purpose.

### (2) Plaintiffs' Videotapes

The County Defendants next seek to prevent the admission into evidence of nine videotapes showing Plaintiffs MM, BD, and DD receiving ABA therapy at or about the time of the County's alleged policy or practice, on the grounds that the tapes have no probative value, are irrelevant, and would be unfairly prejudicial.

The County argues first that the tapes are wholly irrelevant to the main issue in this case—i.e., whether the County had an illegal policy, custom, or practice limiting the amount of 1:1 ABA therapy to eligible children in the County's Early Intervention Program during the period 1993–1996. The videotapes, they assert, can in no way be probative of that question, particularly in view of the fact that the tapes contain no references to the County.

Plaintiffs respond that the tapes are relevant for three reasons: (1) to allow the jury to observe Plaintiffs' condition during the period in question; (2) to familiarize the jury with the manner in which ABA therapy is administered; and (3) to allow the jury to observe the children's progress as ABA therapy is delivered. Plaintiffs further claim that the videotapes are relevant to their damages claims, inasmuch as BD, DD, and MM improved after receiving ABA therapy, and to the claims of Jane Doe and Mayerson (the father of MM) that they suffered emotional distress as a result of the County Defendants' failure to provide appropriate services to their children. Specifically, Plaintiffs argue that the videotapes shed light on the emotional distress claims because they illustrate how, as a result of the County's illegal policy, the children's lack of progress before adequate ABA therapy was provided, and the slower strides the children made thereafter because of lost time, may have contributed to the parents' emotional distress. I agree that the tapes are relevant to Plaintiffs claims, for the reasons they have articulated above.

In the alternative, the County seeks to exclude the tapes as unduly prejudicial, in view of what the County Defendants perceive as the likelihood that the tapes will "insinuat[e] that the County defendants are in some way responsible for the Plaintiffs' diagnosis of autism and for PDD" (County Def. Br. at 6), and thereby elicit a jury verdict based on sympathy.

Plaintiffs answer by citing the four-part test developed by the Tenth Circuit for the determination of whether videotape "day-in-the-life" depictions of physical injury should be admitted. See Bannister v. Town of Noble, 812 F.2d 1265, 1269–70 (10th Cir.1987). Those factors include: (1) whether the tape fairly represents the facts about the impact of the injury or condition of the party; (2) whether the party was aware that he or she was being videotaped such that he or she might have been engaging in self-serving behavior; (3) the risk that the jury might give greater weight to videotape evidence because it is more memorable; and (4) whether the benefit of cross-examination is lost. See id.

These factors weigh in favor of admitting the tapes in this case, Plaintiffs conclude, for

the following reasons: the tapes were made in the ordinary course of therapy for the purpose of assessing the children's progress; unlike "day-in-the-life" tapes, Plaintiffs' tapes were not made for the purpose of litigation—and even if they were, BD, DD, and MM were incapable of engaging in self-serving behavior at the time they were recorded; and any undue weight accorded the tapes by the jury can be remedied through the use of a limiting instruction, specifically, that the tapes are not evidence that the County Defendants caused Plaintiffs' autism. I find Plaintiffs' argument to be persuasive. The videotapes will therefore be admitted at trial.

### (3) Evidence of Liability to Plaintiffs for Certain Compensatory Damages, Costs, and Attorneys' Fees

The County Defendants ask the Court to preclude certain Plaintiffs from raising the issue of their entitlement to various damages and costs at trial. I address each of these separately.

### (a) Unreimbursed Expenses Related to MM's Administrative Hearing

The County Defendants first seek to prevent Plaintiff MM from seeking at trial unreimbursed expenses in connection with MM's state administrative hearing and Article 78 proceeding in the New York State Supreme Court. MM's father, Plaintiff Mayerson, brought a due process hearing before an Administrative Law Judge stemming from his dissatisfaction with MM's treatment, as he was entitled to do under New York Public Health Law § 2549, part of the scheme enacted by New York State in order to comply with the requirements of the IDEA. At that hearing, Mayerson, a lawyer, represented himself and his child. He prevailed in the administrative action, and sought an award of attorneys' fees, which the ALJ denied. Following an Article 78 proceeding brought by Mayerson, Justice John DiBlasi of the New York Supreme Court, Westchester County, upheld the ALJ's determination in a decision and order dated January 6, 1999. See Mayerson v. DeBuono, 181 Misc.2d 55, 694 N.Y.S.2d 260, 265–66 (1999). That decision was on appeal as of October 26, the date County Defendants' Motion was filed.

In this case, Mayerson seeks recovery of "unreimbursed expenses" in connection with the due process hearing and Article 78 proceeding. Mayerson does not specify what those expenses are, but the Court supposes that they include—and may even be limited to—the very "attorneys' fees" that he was not awarded by the state court. Counsel for the Plaintiffs has represented to the Court that he knows of no other unreimbursed expenses incurred by Mayerson, and that is the basis on which the County has briefed the question. Therefore, that is the issue I will address.

In view of the pending state action, the County argues that this Court is barred from exercising jurisdiction over MM's claim for unreimbursed expenses under Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), which precludes federal courts from hearing claims that are the subject of an ongoing state proceeding that raises important state interests. The important interest that the County claims to be at issue here is the ability of the County to devote the resources of its Early Intervention Program to the children eligible for the Program, and not to their parents.

The County further asserts that the interests of judicial economy and sound judicial administration will be best served by this Court's abstention from adjudicating the issue of MM's entitlement to attorneys' fees, on the theory that in so doing, the Court will avoid repetitive litigation.

Factors to be considered in the determination of whether abstention is appropriate include: convenience of the parties; avoidance of piecemeal litigation; the order in which jurisdiction was obtained; and whether federal or state law provides the rule of decision. See Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 15–16, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). The County Defendants argue that those factors favor abstention, because: no parties are inconvenienced by the State Court matter; abstention would avoid a piecemeal decision; and the ultimate question is controlled by New York Public Health

Law § 2549(7)(b), which permits an award of attorneys fees to a prevailing claimant in a due process hearing brought under that section.

In *Younger*, the Supreme Court held that a federal district court could not enjoin an ongoing state criminal proceeding while it entertained constitutional challenges to the criminal statute under which the defendant was being prosecuted when such arguments could be heard and decided in the state proceeding. *See Younger*, 401 U.S. at 50, 91 S.Ct. 746. The Court later extended the doctrine to civil proceedings, including state administrative proceedings. *See Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.*, 477 U.S. 619, 627–29, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986). In order for *Younger* abstention to apply, three factors must be satisfied: (1) there must be an ongoing state proceeding; (2) an important state interest must be implicated; and (3) there must be available to the plaintiff an open avenue for review of constitutional claims in state court. *See Middlesex County Ethics Committee v. Garden State Bar Ass'n*, 457 U.S. 423, 432, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982).

The first of these elements is obviously met here, as Mayerson's appeal is pending in the New York State courts.

The second element requires me to determine whether his claim for expenses in connection with the state proceedings as a component of his damages under his Section 1983 claim in this Court implicates an important interest of the State of New York. I conclude that it does not.

Analysis of this issue requires a brief orientation in the New York law governing Mayerson's state claim. New York Public Health Law § 2549(7)(b), under which Mayerson sought attorneys' fees before the ALJ and in his Article 78 proceeding, is part of Title II–A of the Public Health Law, designated "Early Intervention Program for Infants and Toddlers with Disabilities and Their Families." This law was enacted to satisfy the State's obligations under the IDEA. Title II–A establishes an early intervention program, including procedures for parental involvement in the creation of programs designed to meet the educational needs of individual children. Section 2549 of that enactment, entitled "Due Process," provides parents of disabled children with various procedural avenues to be followed in cases where parents wish to challenge the particular services provided to their children. One of those procedures—the one of which Mayerson availed himself—is an impartial due process hearing before an ALJ. Section 2549(7)(b) in turn confers a statutory right to attorneys' fees in favor of a parent who is successful in a due process hearing where the municipality was represented by counsel.

In Mayerson's case, the ALJ determined that a parent who pursues administrative action under Title II–A pro se, as did Mayerson, is not eligible for an award of attorneys' fees under § 2549(7)(b). Justice DiBlasi affirmed that ruling. *See Mayerson*, 694 N.Y.S.2d at 265–66. Thus, the state interest at issue in that case is the determination of eligibility for attorneys' fees under the mechanism devised by New York State for compliance with its early intervention obligations under the IDEA.

In the present action, Mayerson seeks reimbursement under Section 1983 for the expenses he has incurred as a consequence of the County's illegal policy of limiting ABA therapy to 10 hours per week—which, he claims, include his attorneys' fees in the state action. Mayerson's state claim is addressed to the scope of the fee-shifting provision under New York's early intervention grievance procedure; his Section 1983 claim is directed at the damages he has allegedly suffered as a result of the WCDOH's illegal policy. Although the two claims intersect to the extent that Mayerson is seeking compensation in this Court for sums denied him by the state court, Mayerson's Section 1983 claim in no way undermines the determination by New York courts that a parent-attorney who represents himself is not entitled to attorneys' fees under Title II–A of the New York Public Health Law (which is all the state court held). I therefore cannot conclude that his claim for expenses incurred in the prosecution of the state administrative action, as an element of his damages under his Section

1983 claim, implicates an "important interest" of the State of New York. The County Defendants' motion to preclude this claim on *Younger* grounds thus fails.

That does not end the matter, however. The United States Supreme Court has held that a pro se plaintiff is not entitled to an award of attorneys' fees under 42 U.S.C. § 1988, the fee-shifting provision applicable to section 1983 claims, even if the pro se plaintiff is also an attorney. *See Kay v. Ehrler*, 499 U.S. 432, 438, 111 S.Ct. 1435, 113 L.Ed.2d 486 (1991). In *Kay* (upon which both the ALJ and Justice DiBlasi relied in denying Mayerson's application for fees), the Court determined that the principal intent of Congress in enacting § 1988 was "to enable potential plaintiffs to obtain the assistance of competent counsel in vindicating their rights." *Id.* at 436. This legislative goal includes plaintiffs who also happen to be attorneys, the Court reasoned, because even a skilled lawyer who represents himself is at a tactical disadvantage in litigation: it may not be appropriate for him to appear as a witness, and he is denied the judgment of an independent third party in framing the legal theory of the case, evaluating methods of presenting evidence, cross-examining witnesses, and so on. *See id.* at 437. For that reason, the Court concluded:

> A rule that authorizes of counsel fees to pro se litigants—even if limited to those who are members of the bar—would create a disincentive to employ counsel whenever such a plaintiff considered himself competent to litigate on his own behalf. The statutory policy of furthering the successful prosecution of meritorious claims is better served by a rule that creates an incentive to retain counsel in every such case. *Id.* at 438.

Thus, under *Kay*, Mayerson is not entitled to apply for attorneys' fees to reimburse him for any time he might spend representing his child's interests in the action before me. I can see no reason why *Kay* would not also preclude Mayerson from recovering his attorneys' fees for the state proceeding. The legislative intent underlying attorney fee awards to § 1983 plaintiffs—i.e., to encourage retention of competent counsel—would be no less thwarted by designating the recovery of expenses incurred by a pro se plaintiff in a state proceeding as an element of compensatory damages under § 1983, rather than "attorney's fees" under § 1988. In either case, a pro se plaintiff would be deterred from hiring counsel, with the knowledge that he could enrich himself by recovering attorneys' fees if he prevails on his § 1983 claim. Therefore, to the extent that the "unreimbursed expenses" that Mayerson seeks consist of his time charges or the value of the services he expended in self-representation at his administrative and Article 78 proceedings, I conclude that Mayerson may not recover them in this action.

### (b) Mayerson's Claim for Lost Income during 1996

The County Defendants next argue that Mayerson should be precluded from offering evidence on his claim for lost income during 1996.[2] Plaintiffs allege that Mayerson lost income in 1996 in an amount of approximately $115,000, because the time he was forced to spend on MM's request for services and the resulting administrative hearing made it impossible for him to spend adequate time attending to his law practice. Because Mayerson's overall contribution to his law firm was less in 1996 than in prior years, Plaintiffs claim, so was his compensation.

In support of their argument that no basis exists for this claim, the County points to the following: (1) Mayerson's acknowledgment that there are several factors determining a given year's draw for a particular partner; (2) the absence of anything in writing to explain the decrease in Mayerson's salary; (3) Mayerson's admission that his law firm did better financially in both 1996 and 1998 than in 1997, but that he had more clients in 1997 and 1998; (4) Mayerson's admission that "1996 was a good year" for him; and (5) Mayerson's transition from commercial law to educational law, which the County intimates is less profitable. This last factor is irrelevant to the analysis, as Plaintiffs point

---

2. The County Defendants state in their brief that the year in question is 1997; Plaintiffs state in their response brief that the year is 1996. I take Plaintiffs' representation to be the correct one.

out, because Mayerson did not make the switch to educational law until 1997, a year for which he does not claim lost income.

■ From the remaining factors the County Defendants conclude that Mayerson could not possibly have lost income for 1996. Nothing identified by the County Defendants, however—at least not in the paltry detail provided by them—establishes beyond doubt that Mayerson did not experience a reduction in income for 1996. Mayerson's claim must nonetheless be excluded as excessively speculative and unforeseeable.

■ Damages in a section 1983 case are generally determined according to principles derived from the common law of torts. *See Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 306, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986). Under New York law, tort damages are recoverable only for those injuries that flow directly from, and are the probable and natural consequences of, the wrong alleged; a plaintiff may not seek damages for consequences of the act that are remote and indirect. *See* 36 N.Y.Jur.2d *Damages* § 13 (1984). Applying that rule to the present case, it is simply beyond reason to conclude that a failure by the County to provide sufficient early intervention services to MM during the period 1993–96 was the proximate cause of any loss in income to Mayerson in 1996. The loss in income to the parent of an autistic child is not the natural or probable consequence of a failure to provide adequate therapy to that child. To the contrary, such a result can only be characterized as a remote and indirect outcome of the non-compliance of the WCDOH with its obligations under the IDEA.

Moreover, Plaintiffs have articulated no basis for calculating with reasonable certainty the amount of lost income to Mayerson that may have been caused by the acts of the County. "The damages recoverable in tort actions cannot be contingent, uncertain, or speculative; but if the fact is established that the plaintiff has sustained an actionable injury as the direct result of the defendant's wrongful act, reasonable certainty as to the amount of that injury is all that is required." 36 N.Y.Jur.2d *Damages* § 17. On this point, Plaintiffs merely state in response to the

County's motion that "[t]he facts to be developed at trial will show that MM was diagnosed with autism in early June 1996; that Mayerson was involved in numerous discussions and meetings with WCDOH regarding appropriate services for MM through September 1996 ...; and that Mayerson was subsequently forced to request the due process hearing, which was held over a series of sessions from October 1996 through December 30, 1996." (Pl. Response Br. at 12–13.) Plaintiffs further claim that the facts will show that "Mayerson's income, which had reflected steady growth over the years, declined for the year 1996, which even accounting for other factors, indicates that the MM matter caused the decline." (*See id.* at 13.) None of these assertions, even if proven, would permit the loss of income to Mayerson from the wrongs of the WCDOH to be calculated with reasonable certainty. Mayerson's claim for lost income is therefore excluded.

*(c) Plaintiffs' Emotional Distress Claims*

■ Plaintiffs BD, MM, and DD have brought claims for emotional distress. The County Defendants, who characterize those claims as either negligent or intentional infliction of emotional distress, argue that Plaintiffs may not recover for emotional distress either because their claims are time-barred or they have failed to plead the necessary elements of negligent or intentional infliction of emotional distress under New York law. I need not reach these arguments. As emotional distress is a compensable element of Section 1983 damages, Plaintiffs were not required to articulate a separate theory of recovery for their emotional distress claims. *See Miner v. City of Glens Falls*, 999 F.2d 655, 662 (2d Cir.1993) (citing *Carey v. Piphus*, 435 U.S. 247, 263–64, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978)). The County Defendants' motion to exclude Plaintiffs' emotional distress claims at trial is therefore denied.

*(d) Damages for Plaintiffs' Current or Post–EID Treatment*

MM and BD have asserted claims for the cost of their treatment after they left Westchester County's Early Intervention Program. Specifically: (1) MM seeks damages

for the autism treatment MM is currently receiving as a result of the County's failure to provide adequate early intervention services to MM; and (2) Jean Doe, the mother of BD, has asserted a claim for the more than $30,000 she spent to fund BD's private ABA therapy program to remedy the progress lost during the Early Intervention Program because of the County's ten hour policy.

The County Defendants argue that these claims should be barred at trial because the damages sought in each accrued only after each child had left the Early Intervention Program, and thus, after the County's obligations to them under the IDEA had ceased. But this argument misconstrues Plaintiffs' claims. These Plaintiffs are not seeking damages because the County Defendants failed to provide adequate therapy after they left the Early Intervention Program; rather, their allegation is that the WCDOH's failure to furnish satisfactory treatment while they were in the EIP caused them to incur additional costs after that period for remedial treatment. Hence, to the extent that the County Defendants' actions while MM and BD were in the EIP necessitated extra therapy, the County Defendants' motion is denied.

The County Defendants further argue that BD's alleged failure to raise the issue of reimbursement during the mediation in which BD participated in June 1996 precludes BD from pursuing the post-EID reimbursement claim. The County has not, however, pointed to, nor is the Court aware of, any authority to support the proposition that such claims are waived at trial if not raised first through mediation or administrative action. Accordingly, this argument cannot serve as a basis for excluding evidence on BD's damage claim for post-EID therapy costs.

*(e) Damages for Jane Doe's Resignation of Employment*

 Jane Doe, the mother of DD, claims that she was compelled to quit her job as a nurse for the purpose of setting up and implementing an at-home behavior modification program for DD, and that the period during which she was unemployed was prolonged as a consequence of the need to devise a course of action for DD's treatment. DD was first diagnosed with progressive developmental disorder on April 4, 1996, while DD was going through the evaluations for the Early Intervention Program. Doe resigned her employment on April 10, six days after learning of DD's diagnosis, and before the WCDOH had developed an Individualized Family Service Plan ("IFSP") for DD. The County correctly notes that given this chronology, there can be no causal link between the County's alleged ten hour policy and DD's resignation. The inadequacy of DD's therapy can hardly have induced Doe to quit her job when that therapy was not yet in existence. DD will therefore not be permitted to offer evidence on this claim.

Doe further alleges, however, that the fact that she was forced to set up an at-home treatment program for DD contributed to the length of time she remained unemployed. Again, this claim alleges damages that are both unforeseeable and speculative. The extension of a period during which the parent of an autistic child is unemployed neither flows directly nor results naturally and probably from the failure to provide adequate early intervention services to that child. And the absence of a basis for calculation of reasonably certain damages is even more apparent with respect to this claim than that of Mayerson: Plaintiffs have not even specified the amount of time that Doe remained unemployed, let alone a basis for determining the amount of damages she suffered during that period as a result of the County's acts. Doe's claim for damages stemming from her allegedly lengthened period of unemployment is therefore excluded.

*Plaintiffs' Motion to Consolidate*

On October 13 of last year, Plaintiffs' counsel filed two additional suits, *EE v. DeBuono*, No. 99 Civ. 10596, and *PP v. DeBuono*, 99 Civ. 10597. The Plaintiffs in those cases, "EE," "PP," and "SS," like those in the BD/MM action, are infants with autism or progressive developmental disorder, and participated in Westchester County's Early Intervention Program during the period 1993–96. Plaintiffs have moved to consolidate the

EE and PP cases with the present action pursuant to Fed.R.Civ.P. 42(a), which provides:

> (a) Consolidation. When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

 Trial courts have "broad discretion to determine whether consolidation is appropriate." *See Johnson v. Celotex Corp.*, 899 F.2d 1281, 1285 (2d Cir.1990), *cert. denied,* 498 U.S. 920, 111 S.Ct. 297, 112 L.Ed.2d 250 (1990). Factors relevant to this determination include

> whether the specific risks of prejudice and possible confusion [are] overborne by the risk of inconsistent adjudications of common factual and legal issues, the burden on the parties, witnesses, and available judicial resources posed by multiple lawsuits, the length of time required to conclude multiple suits as against a single one, and the relative expense to all concerned of the single-trial, multiple-trial alternatives. *See id.* (quoting *Hendrix v. Raybestos–Manhattan, Inc.,* 776 F.2d 1492, 1495 (11th Cir.1985)).

The party moving for consolidation bears the burden of demonstrating the commonality of factual and legal issues in the actions it seeks to consolidate. *See In re Repetitive Stress Injury Litig.,* 11 F.3d 368, 373 (2d Cir.1993).

In support of their motion, Plaintiffs argue first that the BD/MM, EE and PP cases share several common legal and factual issues, specifically: (1) all plaintiffs are children and parents who participated in Westchester County's Early Intervention Program during the same time period (1993–96) as those in the BD/MM action; (2) their claims that the County Defendants implemented an illegal policy with respect to ABA therapy all arise from the circumstances surrounding the disclosure of that policy by Plaintiff Mayerson in 1996; (3) their claims against the State Defendants all arise from those Defendants' prior knowledge of the alleged policy and inadequate investigation of Mayerson's system complaint; (4) their claims share the same statutory basis, i.e., Section 1983, the IDEA, and the Rehabilitation Act; and (5) they have sued virtually the same defendants.

 The County Defendants argue that the cases lack common questions of law or fact altogether, reasoning that the factual differences with respect to the early intervention services demanded by and provided to each individual plaintiff preclude the existence of commonality sufficient for consolidation. The County Defendants are incorrect. It is well settled that even one substantial common question of law or fact is enough for commonality under Rule 42(a). *See* 9 Wright & Miller, *Federal Practice and Procedure* § 2384 at 451 (2d ed.1994). Here, not only are Plaintiffs' legal theories identical, but each of their claims arises from the same act of the WCDOH—a practice of limiting ABA therapy—and arose during the same three-year span of time. And as to the State Defendants, each Plaintiffs' claim stems from the NYSDOH's failure to undertake a competent investigation of Mayerson's complaint. If it were a prerequisite that each and every fact relating to each plaintiff's injury be identical, as the County Defendants appear to advocate, it is difficult to conceive of any circumstance in which consolidation would be appropriate. Accordingly, I find the factual and legal issues here to be more than sufficient to satisfy the commonality requirement under Rule 42(a). *See LeGrand v. New York City Transit Auth.,* No. 95–CV–0333, 1999 WL 342286, *8 (E.D.N.Y. May 26, 1999) (consolidation of pregnancy discrimination suits under Section 1983 warranted given common legal issue of existence of same illegal discriminatory practice or policy of defendant).

Plaintiffs next contend that the interests of judicial economy and justice dictate that the cases be consolidated, noting that the expense to the Court and to the parties of litigating the actions together will be less than trying them separately. According to Plaintiffs, the testimony of nearly all of the parties' witnesses, including expert witnesses, will be the same in all cases, with the exception of each Plaintiff's specific early

intervention experience, treatment, and damages. Moreover, Plaintiffs point out, consolidation avoids the risk of inconsistent verdicts.

The County Defendants argue that the interests of justice weigh against consolidation because the cases are at different stages of preparedness for trial, thereby depriving all Defendants of an opportunity to take adequate discovery in the new actions. According to the Case Management Plan set forth by this Court, discovery closed on September 15, 1999, and the case was set to be tried in October, 1999. The parties' Pre–Trial Order was submitted on October 26, 1999, and the pre-trial conference, originally scheduled for December 23, 1999, has been pushed back to late February 2000. The County Defendants contend that in light of the trial-ready posture of the present case, they would be prejudiced by their inability to take discovery of the new plaintiffs were the cases consolidated. They further claim that judicial economy will be hampered by consolidation, since they will have to take discovery of the new plaintiffs, delaying trial of the BD/MM action.

Their concerns are overstated. As Plaintiffs observe, the legal theory underlying all of the cases is identical, so that the evidence of an illegal WCDOH policy has already been gathered. The only discovery Defendants need undertake relates to the uncomplicated question of the particular early intervention services provided to EE, PP, and SS. By moving to consolidate two new cases shortly before discovery ended in the BD/MM action, Plaintiffs in effect warranted to this Court that they could rely on the BD/MM discovery. Therefore, except for discovery pertinent to each new plaintiff, or discovery that Judge Fox finds necessary or desirable to correct any flouting of his previous orders, no additional discovery will be permitted. If Judge Fox decides that it would be appropriate to allow some limited additional discovery that would be pertinent to all Plaintiffs in view of the distance to trial, I will not countermand his wishes. Absent his order, however, no further discovery will be allowed.

Additionally, this Court's trial calendar is full until next September (almost entirely with criminal cases that take precedence over this matter), so the County will have ample time to conduct the limited discovery required for the three consolidated plaintiffs without delaying the trial. I am setting May 10, 2000 as the deadline for additional discovery, and May 31 as the last date for the new parties to file a Pre–Trial Order. I further note that all of the cases the County Defendants cite to support their argument that a new case may not be consolidated with one that is ready for trial involved either proposed consolidation of cases that stood to go to trial immediately with cases in which the bulk of discovery remained to be completed, see, e.g., Mills v. Beech Aircraft Corp., 886 F.2d 758 (5th Cir.1989); Frederick Wildman & Sons, Ltd. v. Frederick Wildman, No. 84 Civ. 1184, 1987 WL 7949 (S.D.N.Y. Mar. 6, 1987); Henderson v. Nat'l R.R. Passenger Corp., 118 F.R.D. 440 (N.D.Ill.1987), or, matters in which the other Rule 41(a) factors did not favor consolidation, see, e.g., Almonte v. Coca–Cola Bottling Co., No. CIV. 3:95CV01458, 1996 WL 768158 (D.Conn. Dec. 12, 1996); Schacht v. Javits, 53 F.R.D. 321, 325 (S.D.N.Y.1971). Again, these are not our facts: most of the discovery that will be required of the County Defendants in the consolidated action has already been taken, and the remaining factors of commonality and judicial economy favor consolidation on the BD/MM, EE, and PP actions.

Finally, the County Defendants argue that consolidation would be particularly unjust with respect to Defendant Mark Rapaport, the former WCDOH Commissioner, because Rapaport had not been served in the action as of December 17, 1999, when the County filed its opposition papers, and thus had no notice of the pending litigation or opportunity to prepare therefor. The County insists that this poses a special risk of prejudice because Rapaport, having been sued in his individual and official capacities, faces personal liability on claims for punitive damages and acts taken outside the scope of employment, neither of which the County is obligated to defend or indemnify. But Rapaport is already a defendant in the BD/MM action, and the issue of his actions under color of state law between 1993 and 1996 has already been the subject of discovery; only his ac-

tions with respect to EE, PP, and SS will require additional discovery. I also note that any prejudice to Rapaport can be further prevented by an adjusted discovery schedule, should the need arise.

For these reasons, Plaintiffs' Motion to Consolidate is granted.

*Trial Date*

The trial of this action will be held on September 11, 2000.

*Conclusion*

For the foregoing reasons, the County Defendants' Motion for Declaratory Judgment is denied; Plaintiff AA's Motion for Voluntary Dismissal without Prejudice is granted; the State Defendants' Motion to Sever is Denied; Plaintiffs' Motion in Limine is granted in part and denied in part (and referred to Judge Fox for Report and Recommendation with respect to CDX–167); the County Defendants' Motion in Limine is granted in part and denied in part; and Plaintiff's Motion to Consolidate is granted.

This constitutes the order and decision of the Court.

## MEMORANDUM DECISION AND ORDER DENYING MOTION FOR RECONSIDERATION

Before me is a motion by the County defendants for reconsideration of my ruling on a motion in limine in which I refused to bar the introduction of certain videotapes (analogous to "day in the life" videotapes) of the infant plaintiffs undergoing ABA behavioral therapy and purportedly demonstrating their improvement over time. The County defendants urge that I overlooked or misapprehended the applicable law and that I should have viewed the videotapes, so that I could see what the County defendants' lawyers are now telling me (after the original decision was handed down) are fatal flaws in the making of the videotapes.

The County defendants could have asserted each and every argument that they make today when they made their original motion in limine. In fact, they did so—they argued last fall, as they argue today, that the videotapes should be kept from the jury because they are irrelevant and prejudicial. Of course, they were far less specific in their criticisms of the videotapes. However, the County defendants have not cited the Court to any case law that was not available when the original motion was briefed. The County defendants point to no evidence concerning the videotapes that qualifies as "newly discovered." The County defendants offer no excuse for not having submitted their "additional evidentiary materials" to the Court when they made their original motion—indeed, they are not even clear about what those materials are. Apparently they include some sort of critique of the videotapes, though movants are so non-specific about what they would like to submit that they do not even give the Court any idea of how much more paper they want me to read. Nonetheless, the movants do not contend that they were incapable of preparing these materials when they first moved, and it seems apparent to the Court that they could and should have submitted any criticisms of the videotapes, "in evidentiary form" or otherwise, when they made their original in limine motion. In particular, challenges to the editorial techniques used in creating the tapes should have been apparent to the County's lawyers when they viewed the tapes prior to making their original motion (which I assume they did).

It appears to this Court that the County defendants engaged in a half-hearted attack on the videotapes the first time around and are now hoping (with the assistance of newly-retained counsel) for a second bite at the apple so at they can do a better job of it. This is not an appropriate use of the motion for reconsideration. For that reason, the motion is denied. Local Civil Rule 6.3, *Lykes Pasco, Inc. v. Ahava Dairy Products Corp.,* No. 97 Civ. 0652, 1998 WL 427570 at *4 (E.D.N.Y. Jan. 26, 1998); *Schonberger v. Serchuk,* 742 F.Supp. 108, 119 (S.D.N.Y.1990). Counsel are free to attack the videotapes at the trial, on cross-examination or with witnesses who can critique the methods used (either to administer the therapy or to tape itself). And the Court is already committed to giving appropriate limiting instructions.